Marlon RAJIGAH, Petitioner,

v.

Mike CONWAY, District Director, New Orleans, Immigration and Naturalization Service; Edward J. McElroy, District Director, New York Immigration and Naturalization Service; David Venturella, Director, Headquarters Post–Order Detention Unit, Immigration and Naturalization Service; Michael J. Garcia, Acting Assistant Secretary for Immigration and Customs Enforcement, Department of Homeland Security; Eduardo Aguirre, Acting Director, Bureau of Citizenship and Immigration Services, Department of Homeland Security; Tom Ridge, Secretary of Homeland Security; John Ashcroft, Attorney General of the United States of America; Gary Copes, Warden, Pine Prairie Detention Facility, Respondents.

No. CV03–1717 (RJD).

United States District Court,
E.D. New York.

June 12, 2003.

Millicent Y. Clarke, Clarke & Associates, Garden City, New York, NY, for the petitioner.

Steven J. Kim, Assistant United States Attorney, Brooklyn, New York, NY, for the respondent.

### MEMORANDUM OF DECISION

DEARIE, District Judge.

On April 9, 2003, petitioner Marlon Rajigah filed the above-captioned petition for a writ of habeas corpus under 28 U.S.C. § 2241 to enjoin his continued detention by Respondents. For the following reasons, the petition was granted on April 24, 2003.

### BACKGROUND

Petitioner Marlon Rajigah is a 41–year-old citizen of Guyana who was admitted to the United States in 1979. He became a lawful permanent resident of the United States in 1982. He is married to a United States citizen and has a six-year-old daughter, both of whom reside in New York.

On February 26, 1998, after a jury trial in Kings County, New York, petitioner was convicted of statutory rape in the Third Degree and endangering the welfare of a child. On July 31, 1998, he was sentenced to six months of incarceration and five years of probation. At the sentencing, Judge Michael Gary extended to Rajigah an offer to serve no jail time upon an admission of guilt. *See* Letter of Anne Swern, Counsel to District Attorney Charles J. Hynes, dated September 19, 2002 ("Swern Letter"). Rajigah declined. On October 25, 1999, the Appellate Division affirmed the conviction, and on December 30, 1999, the Court of Appeals denied leave to appeal. Petitioner surrendered to state authorities on February 25, 2000.

On April 5, 2000, the INS commenced removal proceedings against petitioner on the grounds that pursuant to Section 237(a)(2)(A)(iii) of the Immigration and Nationality Act ("INA"), he had been convicted of an aggravated felony as defined in INA § 101(a)(43), and was therefore removable. On June 19, 2000, after serving four months of his six-month prison term, petitioner was taken into INS custody and detained pursuant to INA § 236(c)(1), pending a final order of removal. On June 21, 2000, Rajigah's request for release on bond was denied by the Immigration Judge ("IJ") on the grounds that he fell within the mandatory detention requirements of INA § 236(c). On August 25, 2000, an Immigration Judge in Oakdale, Louisiana ordered Rajigah removed to Guyana. On April 13, 2001, the Bureau of Immigration Appeals ("BIA") affirmed the IJ's decision, rendering Rajigah's order of deportation final, pursuant to INA § 241.

Petitioner has filed several challenges in federal court, both to his underlying state conviction and to his INS detention and removal order. On May 30, 2000, Rajigah filed a habeas petition, *Rajigah v. Robertson*, No. 00–CV–3062 (referred to in the Government's brief as "*Rajigah III*") pursuant to 28 U.S.C. § 2254, challenging his state conviction. On June 27, 2000, petitioner filed another petition, *Rajigah v. Reno*, No. 00–CV–3802 ("*Rajigah I*"), this time pursuant to 28 U.S.C. § 2241, challenging his INS pre-removal detention under 8 U.S.C. § 1226(c). On April 23, 2001, petitioner filed a second § 2241 petition, *Rajigah v. Ashcroft*, No. 01–CV–2481 ("Rajigah II"), challenging his final order of removal. On April 26, 2001, this Court stayed petitioner's removal pending further order of the Court.

On November 8, 2001, this Court denied all three of Rajigah's petitions and ordered that his stay of removal be lifted ten business days after entry of judgment. Judgment in *Rajigah I* and *Rajigah II* was entered on November 13, 2001. The INS

then secured an emergency travel document from the Embassy of the Republic of Guyana on November 11, 2001, permitting petitioner to travel to Guyana from "November—December 2001." *See* Emergency Certificate, Government's Brief, Attachment C. On November 21, 2001, however, petitioner filed an appeal of the District Court decisions to the Second Circuit, which granted a stay pending the appeal. While petitioner's appeal was still pending, his travel document to Guyana expired.

On June 3, 2002, the Second Circuit dismissed Petitioner's appeal in *Rajigah III,* and on October 21, 2002, the Second Circuit entered an order reflecting petitioner's voluntary withdrawal of his appeal of *Rajigah I* and *Rajigah II.* On October 10, 2002, petitioner filed a written application appealing to the INS to exercise its prosecutorial discretion and defer action against him. In support of this application, Rajigah filed numerous letters advocating for his release, including letters from the Queens District Attorney's Office (namely, the office that prosecuted him in his state criminal trial), his trial and sentencing judge Michael Gary, and several members of Congress. Judge Gary noted in his letter of October 8, 2002, "I have read the letter written by the District Attorney's office, dated September 19, 2002, and agree that the immigration consequences were not contemplated by the sentence I had imposed." Offering a similar statement, the Queens District Attorney's Office wrote, "We believe that justice was fully served by his criminal sentence. Any further incarceration of him or other immigration consequences were never contemplated by us." *See* Swern Letter, attached to Petitioner's Brief.

On November 8, 2002, the INS denied petitioner's application for deferred action. As the memorandum recommending against deferred action from petitioner's

deportation officer, Stanley Steadman, stated, "In light of the nature of his crimes and the numerous disciplinary records, Mr. Rajigah shows a total lack of respect for authority and the laws of this country." *See* Stanley Steadman Memorandum, dated October 24, 2002, Government's Brief, Attachment G. This same memorandum listed a number of disciplinary reports against petitioner, including "being in an unauthorized area," "refusing to obey an order," "defiance," "theft by fraud," and "aggravated disobedience." *Id.*

Having rejected petitioner's deferred action request, on November 26, 2002, the INS formally requested that the government of Guyana issue travel documents for Rajigah. A Guyanese consular official, however, informed the Bureau of Immigration and Customs Enforcement ("BICE") that travel documents for petitioner would be delayed, because petitioner's counsel had alerted the Guyanese Ambassador that another federal court action would be filed. *See* Declaration of Ellarine Alston ("Alston Dec."), Government's Brief, Attachment H, ¶ 7. According to Ms. Alston, the government of Guyana does not issue travel documents to its own nationals if they have any pending actions in court, regardless of whether or not there is a judicial stay of removal. Alston Decl. ¶ 4.

On March 25, 2003, BICE received correspondence from the Guyanese Ambassador, stating that:

[T]he Minister of Home Affairs of Guyana has advised as follows:

1. If proceedings have been filed and are engaging the attention of the Court then a Travel Document in favor of Mr. Rajigah will not be issued.

2. Also, having regard to the particular eye disease from which Mr. Ragjigah suffers, and the fact that there is no treatment or adequate treatment available in Guyana from which Mr.

Rajigah could benefit, it was his view that a Travel Document ought not to be issued to Mr. Rajigah.

Alston Decl. ¶ 8.

Petitioner has submitted documentation to the Court confirming the "eye disease" referred to in the Guyanese Embassy letter. As a letter dated November 26, 2001 from Dr. Martin J. Fox, petitioner's treating physician from 1990 to 1999, states,

Mr. Rajigah suffered extensive/severe trauma to his left eye in June, 1990 that required surgical and medical ophthalmic care. He sustained a ruptured globe with uveal prolapse which in lay terms means that parts of the internal contents of the left eye were outside of the eye requiring surgical intervention and repair. Subsequently, he required an intraocular lens implant and thereafter subsequent YAG laser treatment to improve the vision . . . . Having suffered such severe injury, he should have regular and scheduled ophthalmic follow up, as there is a heightened risk of uveitis (inflammation of the eye) which causes severe pain, photophobia (light sensitivity) and decreased vision. . . . Yet another risk is retinal detachment, which could manifest as seeing floaters, flashes of light and decreased vision. If not corrected immediately, it would cause permanent loss of vision.

(Letter from Dr. Martin Fox, Petitioner's Brief, Exhibit C.)

Dr. Fox reported that after reviewing petitioner's medical records and speaking with petitioner, he determined that petitioner was "currently experiencing floaters, light sensitivity and decreased vision, which was tested approximately two weeks ago at 20/100." *Id.* Such symptoms represented a "significant decrease in vision" from Dr. Fox's last examination of petitioner. *Id.* Dr. Fox concluded that based upon petitioner's history and his current complaints and symptoms, "Mr. Rajigah requires immediate medical attention by a trained ophthalmologist and/or retinal specialist. Failure to do so may cause permanent loss of vision." *Id.*

The Government contends that petitioner's eye condition does not require special treatment and should be treatable in Guyana. As it states in its brief, "On March 28, 2003, BICE was informed that, on April 25, 2002, an ophthalmologist evaluated Petitioner, prescribed eyeglasses for a mild refractive error, and concluded that he did not require any special treatment and that he should be able to be seen by a regular ophthalmologist as needed in Guyana." *See* Government's Brief at 6, citing Alston Decl. ¶ 9(b); medical report dated May 3, 2002 from Dr. Eugene A. Migliaccio. The Government's subsequent submission of April 21, 2003, however, concedes that the earlier statement that petitioner was examined by an ophthalmologist was incorrect. As the Government acknowledges, "Regarding the medical exam, contrary to the letter dated May 3, 2002, from Dr. Eugene A. Migliaccio (Attachment J annexed to Respondents' Return), Petitioner was examined by an optometrist and not an ophthalmologist." *See* Government's Letter, dated April 21, 2003.

On April 9, 2003, petitioner filed the instant habeas petition. On April 15, 2003, BICE officials met with the Guyanese Ambassador regarding petitioner. Alston Decl. ¶ 12. The Guyanese Ambassador advised that his government would not issue a travel document for petitioner because of the pending petition, and that his Minister of Home Affairs counseled against granting travel documents to petitioner due to his eye condition. *Id.*

The Government asserts that in response to what the Guyanese Ambassador advised at this meeting, "[a] démarche will be filed with the government of Guyana as

early as April 16, 2003, threatening sanctions under 8 U.S.C. § 1253(d) (Supp. V 1999) if it does not issue a travel document to Petitioner forthwith."[1] *See* Government's Brief at 7, citing Alston Decl. ¶ 13. As part of the démarche, the Government plans to include medical reports which the Government maintains conclusively demonstrate that petitioner does not require special treatment and that his eyes should be treatable in Guyana. The Government argues that since the Guyanese government reversed its position against issuing travel documents in a prior instance in 2001 in which sanctions were imposed by the US, "BICE believes that the Guyanese government will issue travel documents for Petitioner shortly after the filing of the démarche." Government's Brief at 7, citing Alston Decl. ¶ 14. The Government has yet to file any documentation regarding the démarche with the Court.

## DISCUSSION

### I. Legal Framework

When a final order of removal has been entered against an alien, the Government typically secures the alien's removal during the subsequent 90–day period, referred to as the "removal period." *See* 8 U.S.C. §§ 1231(a)(1)(A)-(B). During the removal period, the alien is normally held in custody. *Id.* The Attorney General may continue to detain an alien beyond the removal period if the alien was ordered removable due to certain violations of criminal law, or is determined to be a "risk to the community or unlikely to comply with the order of removal." 8 U.S.C. § 1231(a)(6). Moreover, the removal period may be extended beyond 90 days if the alien "fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal." 8 U.S.C. § 1231(a)(1)(C).

The Supreme Court clarified the constitutional limits of post-removal period detention under § 1231(a)(1)(6) in *Zadvydas v. Davis*, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001). Rejecting the argument that the Attorney General could detain aliens falling within the § 1231(a)(1)(6) category indefinitely, it held that if post-removal order detention is required, such detention may only be for a period that is "reasonably necessary to bring about the alien's removal from the United States." *Zadvydas*, 533 U.S. at 689, 121 S.Ct. 2491. As the Court stated, the habeas court "should measure reasonableness primarily in terms of the statute's basic purpose, namely assuring the alien's presence at the moment of removal." *Id.* at 699, 121 S.Ct. 2491. Thus, if the habeas court found that removal was not reasonably foreseeable, it "should hold continued detention unreasonable and no longer authorized by statute." *Id.* at 699–700, 121 S.Ct. 2491.

For the sake of uniformity, the Court recognized a 6–month period as a presumptively reasonable time period for accomplishing removal. *Id.* at 701, 121 S.Ct. 2491. After the six-month period, however, "once the alien provides good reason to believe that there is no significant likelihood of removal, the Government must respond with evidence sufficient to rebut that showing." *Id.* The Court acknowledged that the 6–month presumption was not a bright-line rule, requiring all aliens not removed within 6 months to be released. As it stated, "[t]o the contrary, an

---

1. As the Government's brief explains, under 8 U.S.C. § 1253(d), consular officials in a foreign country shall be ordered to discontinue granting visas to citizens, subjects, nationals, and residents of that country if it denies or unreasonably delays issuing travel documents for the purposes of repatriation. *See* Government's Brief at 7, n. 3.

alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.*

After *Zadvydas,* the Attorney General established regulations to govern whether there is a significant likelihood that an alien will be removed in the reasonably foreseeable future. *See* 8 C.F.R. § 241.13. As the regulations state, detention of an alien may continue while the INS' Headquarters Post-order Detention Unit ("HQPDU") determines whether or not a significant likelihood of removal exists. § 241.13(b)(2). This determination may be triggered by a written request submitted by the alien to the HQPDU "asserting the basis for the alien's belief that there is no significant likelihood that the alien will be removed in the reasonably foreseeable future...." § 241.13(d)(1). The HQPDU then has 10 business days after the receipt of the request to "respond in writing to the alien, with a copy to counsel of record, by regular mail, acknowledging receipt of the request for a review under this section and explaining the procedures that will be used to evaluate the request." § 241.13(e)(1). The HQPDU must then assess the alien's efforts to comply with the removal process as well as a host of other factors, and issue a written decision to the alien with a copy to counsel of record. §§ 241.13(e)(2), (f), (g).

## II.  Jurisdiction / Exhaustion of Administrative Remedies

Petitioner contends that he is being detained in contravention of the Supreme Court's holding in *Zadvydas.* Respondents counter that his detention remains presumptively valid, and that the instant petition should dismissed.

At the outset, respondents suggest that petitioner has failed to exhaust all of his administrative remedies under § 241.13, and that such failure alone provides grounds for dismissal of his petition. Petitioner disputes whether the doctrine of administrative exhaustion is strictly applied to cases challenging custody determinations, but argues that nevertheless he has exhausted his administrative claims.

■ This Court makes no findings regarding whether exhaustion of the administrative procedures outlined in § 241.13 is a necessary prerequisite to federal judicial review. Instead, it concludes that even if § 241.13 is jurisdictional, petitioner has exhausted his administrative remedies pursuant to § 241.13. Indeed, on March 31, 2003, petitioner's counsel, Rita Dave, filed a written request explicitly invoking § 241.13, citing the Guyanese Embassy's letter of March 26, 2003, as the reason it was unlikely that petitioner would be removed in the reasonably foreseeable future. *See* Dave Letter, dated March 31, 2001, Petitioner's Brief, Attachment. Faced with such a request, under § 241.13(e)(1), the HQPDU had 10 business days after it received the request to respond in writing to petitioner and Ms. Dave, acknowledging receipt of the request and explaining the procedures that would be used to evaluate it. As of April 24, 2003, however, the HQPDU had made no such written response. There are no further provisions in the regulations for a petitioner to pursue once the HQPDU has failed to respond to its written request. Accordingly, the Court deems the petitioner's administrative remedies exhausted.

## III.  The Merits

### A.  Status of Petitioner's Ongoing Detention

Turning to the merits of petitioner's claim, petitioner asserts that he has been in INS detention awaiting removal since April 13, 2001, the date that the BIA af-

firmed the IJ's final order of removal. Thus, he argues, the post-order removal period exceeds two years, well over the six-month "presumptively reasonable" period prescribed by *Zadvydas*. Moreover, petitioner points out that he has never been adjudged to be a flight risk or a danger to the community. Respondents assert that because they have not had "one unencumbered month" of post-order custody in which to remove petitioner, petitioner's present detention remains presumptively valid.[2]

■ Section 1231 states that if an alien acts to frustrate the INS' ability to remove him, the removal period is tolled during the period of the alien's actions. 8 U.S.C. § 1231(a)(1)(C); *Powell v. Ashcroft*, 194 F.Supp.2d 209, 210 (E.D.N.Y.2002). The limited case law on what constitutes a "frustration of removal" has not interpreted this phrase expansively: courts have only tolled the removal period in cases where the alien has sought and received a stay of removal through judicial action (*see Akinwale v. Ashcroft*, 287 F.3d 1050, 1052 (11th Cir.2002)), or where the alien has demonstrated some sort of bad faith failure to cooperate, such as providing the INS with false or inconsistent information regarding his identity or country of origin (*see Powell, supra; Ncube v. INS*, No. 98 Civ. 0282, 1998 WL 842349 at *16 (S.D.N.Y. Dec.2, 1998)), or refusing to complete travel arrangements or name a

country for deportation (*Riley v. Greene*, 149 F.Supp.2d 1256, 1262 (D.Colo.2001); *Sango–Dema v. District Director*, 122 F.Supp.2d 213, 221 (D.Mass.2000); Cf. *Ford v. Quarantillo*, 142 F.Supp.2d 585, 588 (D.N.J.2001) (ordering release of alien detained for 14 months, even though he misrepresented his country of origin)). Indeed, as *Seretse–Khama* has held, a petitioner's truthful statement (such as expressing that he did not wish to return to his country of origin) which is later adopted by the country of origin as a reason for not wanting to repatriate that alien, is not an example of refusal to cooperate under § 1231(a)(1)(C), and cannot be used as a grounds for extending post-removal detention. *Seretse–Khama v. Ashcroft*, 215 F.Supp.2d 37, 50–53 (D.D.C. 2002).

■ In the instant case, petitioner has not acted in bad faith. There is no evidence of his failure to cooperate-all we have is petitioner's request for a stay of removal, which he obtained from this Court on April 26, 2001. However, prior to receiving this stay, petitioner had been in custody post-final removal order since April 13, 2001, thirteen days prior. Furthermore, between the date petitioner's judicial stay was lifted on October 21, 2002 (when petitioner withdrew his Second Circuit appeal) and April 9, 2003, the date he filed the instant habeas petition, five months and nineteen days elapsed. Put-

---

**2.** The Court notes that while INA § 236(e) deprives it of jurisdiction to review the INS District Director's November 8, 2002 decision denying petitioner deferred action status, in light of the submissions received from petitioner and his counsel, the Court has questions about the circumstances surrounding this decision. Indeed, petitioner's counsel has raised allegations of harassment, abuse, retaliation and trumped-up infractions by the guards and officials of the Pine Prairie / FDC Oakdale Facility. According to petitioner, many of the infractions which were later in-

voked in the denial of his deferred action status-including citations for "theft of property" for wearing pants which were issued to him upon his arrival at the facility-were concocted to retaliate against him for reporting the beating of another detainee, a report which resulted in certain guards being fired or demoted. While the Court makes no findings regarding these incidents, it cites them in order to comment that if they have a basis in truth, the INS has much to examine and reform regarding its own internal grievance and disciplinary process.

ting together those five months and nineteen days with the thirteen days in April 2001, there have been more than six unencumbered months that the INS has had to effectuate petitioner's removal. Even if the Court considers November 8, 2002, the date the INS denied petitioner's application for deferred action, as the proper starting date for counting purposes (even though there was nothing to stop the INS from removing petitioner even while it was considering his application), there were five full unencumbered months in which the INS could have effectuated removal before petitioner filed the instant application.[3]

Respondents attempt to argue that during this period, petitioner was "frustrating his removal" because his counsel had advised the Guyanese Ambassador that he intended to file another court action, and the Guyanese government had a policy of not issuing travel documents to its nationals who file court actions. Respondents cite no case law, however, to support its argument that such truthful communication to an embassy falls within the purview of § 1231(a)(1)(C). Indeed, such a circumstance seems akin to the situation in *Seretse–Khama*, in which a truthful communication by petitioner which led an embassy to deny travel documents was deemed *not* to be an effort not to frustrate removal under § 1231(a)(1)(C). Respondent has made no demonstration that petitioner has in any way acted in bad faith-he has simply availed himself of judicial process and communicated to the Guyanese embassy his plans to do so. Accordingly, the Court finds that the INS has had over six unencumbered months in which to attempt to effectuate petitioner's removal.

### B. No Significant Likelihood of Removal in the Reasonably Foreseeable Future

Furthermore, petitioner has satisfied his burden of "provid[ing] good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Zadvydas* at 701, 121 S.Ct. 2491. Indeed, he has submitted a letter from the Guyanese Ambassador, stating that the embassy will not issue travel documents to him both because of his pending judicial proceedings and because of his inability to receive adequate medical treatment for his eye disease in Guyana. Moreover, petitioner has also presented medical reports from his eye doctor, confirming his eye disease and his need for "immediate medical attention by a trained ophthalmologist and/or retinal specialist" as well as "regular and scheduled ophthalmic followup." (Letter from Dr. Martin Fox, Petitioner's Brief, Ex. C.) Such evidence is sufficient to satisfy petitioner's *Zadvydas* burden: it demonstrates that Guyana is unlikely to take petitioner back so long as it lacks the medical capability to treat his eye disease. Hence, plaintiff has shown that there is a significant likelihood that he will not be removed in the reasonably foreseeable future.

### C. Government's Rebuttal Evidence

Once petitioner has made such a showing, "the Government must respond with evidence sufficient to rebut that showing." *Zadvydas* at 701, 121 S.Ct. 2491. In the instant case, however, the Government's rebuttal evidence that petitioner is likely to be removed shortly is speculative at best. Indeed, the Government relies on

---

**3.** Indeed, while *Zadvydas* lays out a presumptive six-month period of reasonable detention for the sake of uniformity, the opinion also reminds us that post-removal detention is meant to assure the alien's presence at the moment of removal and that "once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statue." *Zadvydas*, 533 U.S. at 699, 121 S.Ct. 2491.

four arguments to rebut petitioner's showing: 1) that Guyana regularly issues travel documents to its nationals, 2) that Guyana actually issued a travel document to petitioner in November 2001, 3) that BICE will be filing a démarche with the government of Guyana threatening sanctions if it does not issue travel documents to petitioner, and that Guyana has responded to prior threats of sanctions by issuing travel documents forthwith, and 4) that with the démarche, the Government will include medical reports that conclusively demonstrate that petitioner's eye condition does not require special treatment, thus rendering him able to be treated in Guyana.

Such arguments, however, do not provide any conclusive evidence that petitioner will be removed in the near future. Evidence of what the Guyanese government has done in the past with respect to petitioner and with respect to other nationals sheds little light on how the Guyanese government will respond to the current situation. Indeed, the fact that the Guyanese government regularly issues travel documents and issued travel documents to petitioner in the past merely indicates that its general protocol is to issue travel documents, and that it must have a specific reason why it will not issue travel documents to petitioner at this time. Furthermore, the Government has offered no evidence that the proposed démarche has actually been filed, and the Court finds it difficult to infer from a prior circumstance of threatened sanctions against Guyana, which may or may not have been akin to the situation at hand, that travel documents will necessarily issue as soon as it is filed.

Lastly, the Government provides no reliable evidence to rebut the medical reports provided by petitioner's ophthalmologist, Dr. Fox. In fact, in attempting to rebut Dr. Fox's report, the Government incorrectly advised the Court that an *ophthalmologist* found petitioner not to have any serious eye problems, when in fact, he was only seen by an *optometrist*, an individual who does not have a medical degree. Moreover, the Public Health certification, which relied upon the optometrist's report in reaching its conclusion that petitioner does not require any special treatment (but which also mistakenly refers to the report as an "ophthalmologist's report"), similarly was not performed by a medical doctor, but rather by a "Dr. P.H.," presumably an individual with a doctorate in public health. Thus, none of the Government's rebuttal evidence is based upon an evaluation by a medical doctor, much less an ophthalmologist specializing in eye disease. Hence, the Government has provided no competent medical evidence to rebut the conclusion of petitioner's ophthalmologist, who found petitioner in need of immediate ophthalmic care and regular ophthalmic followup.

## CONCLUSION

Thus in sum, the Court finds that the Government has failed to rebut petitioner's showing that there is no significant likelihood that he will be removed in the reasonably foreseeable future. For the foregoing reasons, petitioner's writ of habeas corpus was granted on April 24, 2003.

SO ORDERED.

## ORDER

On April 9, 2003, petitioner Marlon Rajigah filed the above-captioned petition for a writ of habeas corpus under 28 U.S.C. § 2241 to enjoin his continued unlawful detention by Respondents. The petition is hereby granted. A Memorandum of Decision will issue shortly.

Respondents are ordered to release petitioner immediately and to impose appro-

priate conditions for petitioner's release in an order of supervision.

SO ORDERED.