**Abdirahman MOALLIN**

v.

**Mark CANGEMI, Interim Director, and Bureau of Immigration and Customs Enforcement**

**No. 05–CV–1826(JMR/SRN).**

United States District Court,
D. Minnesota.

April 12, 2006.

tronic transmission, we decline to recommend suppression on that ground.

Katherine Menendez, Assistant Federal Public Defender, on behalf of Petitioner.

Joan D. Humes, Assistant United States Attorney, on behalf of Respondents.

### ORDER

Respondents object to the Report and Recommendation, issued January 17, 2006 [Docket No. 9], by the Honorable Susan Richard Nelson, United States Magistrate Judge. The Report recommended that petitioner's application for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 be granted, and that petitioner be released from custody. Respondents' objections were timely filed pursuant to Local Rule 72.2(b).

Based upon a de novo review of the record herein, the Court adopts the Magistrate's Report and Recommendation.

Accordingly, IT IS ORDERED that:

1. The petition under 28 U.S.C. § 2241 for a writ of habeas corpus [Docket No. 1] is granted.

2. Respondents are directed to advise the Court and counsel for petitioner on or before April 13, 2006, of conditions they suggest are necessary to assure the Court of access to, and control over, the petitioner pending removal.

3. Upon this Court's Order setting conditions of release, the petitioner shall be released from custody pursuant to this Order.

### *REPORT AND RECOMMENDATION*

NELSON, United States Magistrate Judge.

The above entitled matter comes before the undersigned United States Magistrate Judge on the petition of Abdirahman Moallin for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 (Doc. No. 1). This matter has been referred to the undersigned for a report and recommendation under 28 U.S.C. § 636 (2000) and D. Minn. L.R. 72.1. For the reasons given below, the Court recommends that the petition be granted and a writ issue releasing Petitioner from custody, subject to such terms and conditions as may be necessary to ensure that Respondents will be kept apprised of his whereabouts pending his removal.

## I. BACKGROUND

### A. *Facts*

Petitioner was born in Mogadishu in the Banadir province of Somalia on February 25, 1979. (Admin. Record (hereafter R.), Doc. No. 6, at 2.) At age eleven, Petitioner fled war torn Somalia to Kenya. (*See id.*) On August 18, 1994, at age fifteen and while in Kenya, he applied to enter the United States as a refugee. (*See id.*) His application states his reason for seeking the refugee classification (reprinted verbatim):

> When the war broke out the City of Mogadishu our neighborhood become target for the shells and burglars and rabist that resulted our father killed militia and our mother beaten badly and also our house demolished totaly and properties looted. After that we been smuggled to Kismayo[, Somalia] except our mother in order to assist our sister who has six child. We faced another problem and then fled.

(*Id.*) At the time Petitioner filed his application for refugee status, his mother and half-brother were already living in the United States in Alexandria, Virginia. (*Id.* at 3, 59.) Petitioner's application was approved, and he was admitted to the United States as a refugee on February 1, 1995. (R. at 3, 6.) On May 15, 1996, the United

States accorded Petitioner lawful permanent resident status. (R. at 1, 6.) The administrative record does not describe Petitioner's whereabouts or activities from the time of his entry until the year 2000. In the years 2000–2004, however, Petitioner was charged with and pled guilty to six crimes in two states, including theft of rental cars, buying a stolen car, and stealing telephone cards and liquor. (R. at 9, 14–15, 37–40, 44–45, 49–50, 59–62, 63.) The specific conviction dates and locations of the crimes are as follows:

> April 12, 2000: Petit Larceny (Virginia), theft of alcoholic beverage less than $200
>
> August 9, 2000: Petit Larceny (Virginia), theft of telephone cards
>
> January 16, 2001: Petit Larceny (Virginia), theft of a rental car
>
> July 30, 2001: Forgery of a Public Document and Receiving Stolen Property (Virginia)
>
> January 20, 2004: Theft of a Motor Vehicle and Fleeing a Police Officer (Minnesota)
>
> December 1, 2004: Theft of a Motor Vehicle (Minnesota)

(R. at 9.) Petitioner received sentences ranging from ten days to three years for committing these crimes. (*Id.*) His January 20, 2004 conviction stems from an incident on August 21, 2001 during which Petitioner stole a car. (R. at 22.) When law enforcement officers attempted to stop him while he was driving the car without a license, Petitioner led them on a 2.3 mile car chase at night, with the car's headlights off, during which he exceeded 80 miles per hour in a posted 30 mile per hour zone. (*Id.*) The chase ended when Petitioner crashed the car. (*Id.*) In sentencing Petitioner for this conviction, the state judge departed upward because she found Petitioner: (1) continued to commit crimes while the matter was pending; (2) used multiple aliases, (3) failed to cooperate with the presentence investigation or probation; (4) was not amenable to probation; and (5) had outstanding warrants in Washington D.C., Michigan, Virginia, and Ramsey County. (R. at 33.)

On December 3, 2004, the U.S. Bureau of Immigration and Customs Enforcement (ICE), formerly the Immigration and Naturalization Service, issued Petitioner a Notice to Appear, which ordered Petitioner to appear before a U.S. Department of Justice immigration judge "to show why [Petitioner] should not be removed from the United States based on" violations of the Immigration and Nationality Act, the relevant provisions of which are codified at 8 U.S.C. § 1227(a)(2)(A)(ii)-(iii) and which read:

> Any alien who at any time after admission is convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct, regardless of whether confined therefor and regardless of whether the convictions were in a single trial, is deportable.... Any alien who is convicted of an aggravated felony at any time after admission is deportable.

The United States represents that Petitioner was taken into ICE custody upon release from his criminal sentence[1] and

---

1. The parties do not indicate exactly when Petitioner was taken into ICE custody. The administrative record indicates ICE "located" Petitioner on September 2, 2004 at the jail in Olmsted County, Minnesota. (*See* R. at 8, 10, 11.) On the same date, a recommendation of "No Bond" was recorded. (R. at 10.) Reference is also made to an INS officer receiving "Subject" and advising "[a]lien ... of communication privileges" on December 3, 2004. (R. at 8.) Petitioner was notified why he was "arrested" on December 3, 2004. (R. at 13.) Petitioner's habeas petition avers, "Petitioner has been in ICE custody *since around* Decem-

that Petitioner appeared before an immigration judge in Bloomington, Minnesota on December 16, 2004. (Doc. No. 5 at 3.) On December 16, 2004, the immigration judge determined that Petitioner was subject to removal and ordered him removed from the United States to Somalia. (R. at 73.) Petitioner expressly waived his right to appeal this decision to the Board of Immigration Affairs. (*Id.*) On the same day, the field office director for ICE issued a warrant of removal/deportation which directed "any officer" of ICE "to take into custody and remove" Petitioner "from the United States." (R. at 74.) Petitioner has been civilly detained ever since.

On January 20, 2005, Petitioner was given written notice of a nationwide injunction barring the removal of certain aliens to Somali (R. at 77) as required by *Ali v. Ashcroft*, 213 F.R.D. 390, 397 (W.D.Wash. 2003), *aff'd*, 346 F.3d 873 (9th Cir.2003), *opinion withdrawn on denial of reh'g*, 421 F.3d 795 (9th Cir.2005), *as amended on reh'g* (Oct. 20, 2005).[2] ICE informed Petitioner that the nationwide injunction prevented his removal but that his case would be reviewed on a monthly basis to determine if the injunction had been lifted. (Doc. No. 5 at 4.) Specifically, on March 16, 2005, ICE sent Petitioner a letter captioned, "Ineligibility for Custody Review Under 8 C.F.R. 241.4." That letter states:

A review of your case indicates that you are under a court ordered stay of removal. The stay prevents the Immigration and Naturalization Service (Service) from enforcing your removal order. Under 8 Code of Federal Regulations section 241.4, the Service must conduct a

custody review before the end of the removal period. However, for an alien whose removal order is under judicial review (including habeas corpus) and where the alien has been granted a judicial stay of removal, the removal period does not begin until the date on which the court issues a final order pursuant to 8 USC 1231(a)(1)(B)(ii), [8 C.F.R. § ] 241(a)(1)(B)(ii). This letter is to inform you that your case has been reviewed and it has been determined that you do not qualify for a custody review under 8 CFR 241.4.

Your case will be reviewed on a monthly basis to determine if your stay has been lifted or if some form of relief has been granted. Once your stay is lifted you will be provided with a 30–day notice prior to any custody review. At that ·time, you may submit information in writing in support of your case.

(R. at 89.) Also on March 16, 2005, the ICE field office director issued a "Post Order Custody Review Worksheet," which indicates that, as of that date, Petitioner had no prior disciplinary reports and no disciplinary reports or incidents while in ICE custody. (R. at 93.) The ICE review worksheet also indicates that Petitioner met none of the regulatory criteria for continued detention (i.e., he had no highly contagious disease that is a threat to public safety, no serious foreign policy consequences would result from his release, no security or terrorism concerns were present, and was not likely to be violent in the future.)· (R. at 96.) Nonetheless, the director recommended continued detention

ber 16, 2004." (Doc. No. 1 at 2 (emphasis added.))

**2.** On January 17, 2003, the United States District Court for the Western District of Washington enjoined ICE from removing any "persons in the United States with final orders of removal, expedited removal, deportation or

exclusion to Somalia," except those persons having writs of habeas corpus pending, or on appeal, as of the date of the court's order because the court found that there was no central functioning government in Somalia. (R. at 78.)

because he believed "subject to be a continued threat to society" due to his criminal record, his commission of crimes shortly after being released from custody, his attempt to evade law enforcement, his refusal to comply with law enforcement orders, and the state court judge's reasons for departing upward on Petitioner's July 2004 conviction. (R. at 97.)

On August 15, 2005, Petitioner filed the petition for writ of habeas corpus now before the Court. (Doc. No. 1.) In his petition, he alleges that he is being held in custody unlawfully and should be released immediately because his "continued indefinite detention in ICE custody is unlawful under *Zadvydas v. Davis*," 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) because "[h]is custody has exceeded 6 months and it is not likely that he will be removed to Somalia soon in light of the lack of [a] functioning government in that country." (Doc. No. 1 at 3.) On August 17, 2005, this Court ordered ICE to show cause why the writ should not be granted. (Doc. No. 2.) On September 16, 2005, the United States filed a Return to Order to Show Cause (Doc. No. 5), and, on September 21, 2005, Petitioner filed a response (Doc. No. 8). The Court has *not* ordered a stay of Petitioner's removal pending consideration of his petition.

### B. *Legal Context*

### 1. *Relevant Statutes and Agency Regulations*

"Pending a decision on whether the alien is to be removed from the United States," 8 U.S.C. § 1226(a), "[t]he Attorney General shall take into custody any alien who . . . is deportable by reason of having committed any offense covered in [8 U.S.C. § ] 1227(a)(2)(A)(ii), (A)(iii),(B),(C), or (D)" 8 U.S.C. § 1226(c)(1)(B). During this pre-removal period of time, pursuant to the authority granted in 8 U.S.C. § 1226(c),

the Attorney General may release the alien pending the final removal decision only in limited circumstances. *See* 8 U.S.C. § 1226(c)(2).

Congress has provided in 8 U.S.C. § 1231(a)(1) that: "[W]hen an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the "removal period")." Pursuant to 8 U.S.C. § 1231(a)(1)(B):

> The removal period begins on the latest of the following:
>
>> (i) The date the order of removal becomes administratively final.
>>
>> (ii) *If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order.*
>>
>> (iii) If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement.

(emphasis added). "During the removal period, the Attorney General shall detain the alien." § 1231(a)(2).

In certain circumstances, if the Attorney General fails to remove an alien within the removal period, he may detain the alien beyond the removal period. Pursuant to 8 U.S.C. § 1231(a)(6):

> An alien ordered removed [1] who is inadmissible . . . [2][or] removable [as a result of violations of status requirements or entry conditions, violations of criminal law, or reasons of security or foreign policy] or [3] who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to [certain] terms of supervision . . .

To determine if detention beyond the removal period is warranted under

§ 1231(a)(6), "[p]rior to the expiration of the removal period," the applicable ICE district director must conduct a custody review for a detained alien. 8 C.F.R. § 241.4(k)(1)(i). Before the alien can be released, the director must consider certain factors set forth in ICE regulations.[3] The district director of ICE must conclude that:

(1) Travel documents for the alien are not available or, in the opinion of [ICE], immediate removal, while proper, is otherwise not practicable or not in the public interest;

(2) The detainee is presently a non-violent person;

(3) The detainee is likely to remain non-violent if released;

(4) The detainee is not likely to pose a threat to the community following release;

(5) The detainee is not likely to violate the conditions of release; and

(6) The detainee does not pose a significant flight risk if released.

*Id.* § 241.4(e). If the director determines that the alien cannot be released, the alien is detained for up to another 90 days after the expiration of the 90-day "removal period." *Id.* § 241.4(k)(1)(ii). At the end of this cumulative six-month period, a two-person panel of ICE executives again reviews the alien's records and determines if his release is warranted. *Id.* § 241.4(i)(1)-(3), (k)(2)(ii). If the panel decides not to release the alien, then it must again review the propriety of the alien's continued detention within "approximately" a year after its detention decision, although the alien can request a more prompt review upon a showing of a material change in circumstances since the last review. *Id.* § 241.4(k)(2)(iii).

### 2. Recent Court Decisions

### a. *Zadvydas v. Davis:* Three Time Periods of Removal Identified

In 2001, in *Zadvydas v. Davis*, the United States Supreme Court decided whether § 1231(a)(6) and the above regulations created pursuant to that statute "authorize[ ] the Attorney General to detain a remova-

---

**3.** (f) The factors include, but are not limited to:

(1) The nature and number of disciplinary infractions or incident reports received when incarcerated or while in [ICE] custody;

(2) The detainee's criminal conduct and criminal convictions, including consideration of the nature and severity of the alien's convictions, sentences imposed and time actually served, probation and criminal parole history, evidence of recidivism, and other criminal history;

(3) Any available psychiatric and psychological reports pertaining to the detainee's mental health;

(4) Evidence of rehabilitation including institutional progress relating to participation in work, educational, and vocational programs, where available;

(5) Favorable factors, including ties to the United States such as the number of close relatives residing here lawfully;

(6) Prior immigration violations and history;

(7) The likelihood that the alien is a significant flight risk or may abscond to avoid removal, including history of escapes, failures to appear for immigration or other proceedings, absence without leave from any halfway house or sponsorship program, and other defaults; and

(8) Any other information that is probative of whether the alien is likely to—

(i) Adjust to life in a community,

(ii) Engage in future acts of violence,

(iii) Engage in future criminal activity,

(iv) Pose a danger to the safety of himself or herself or to other persons or to property, or

(v) Violate the conditions of his or her release from immigration custody pending removal from the United States.

8 C.F.R. § 241.4(f).

ble alien *indefinitely* beyond the removal period or only for a period *reasonably necessary* to secure the alien's removal." 533 U.S. 678, 682, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001). In *Zadvydas,* the United States argued that § 1231(a)(6) set no "limit on the length of time beyond the removal period that an alien who falls within one of the Section 1231(a)(6) categories may be detained." *Id.* at 689, 121 S.Ct. 2491. The *Zadvydas* Court did not refute the United States' interpretation of the express language of the statute but "read an implicit limitation into the statute" because of the "serious constitutional problem" that would be raised by permitting indefinite detention of an alien. *Id.* The Court found that "nothing in the history of these statutes ... clearly demonstrates a congressional intent to authorize indefinite, perhaps permanent, detention. Consequently, interpreting the statute to avoid a serious constitutional threat, we conclude that, once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." *Id.* at 699, 121 S.Ct. 2491.

The Court found it significant that in enacting the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Congress shortened the relevant removal period from six months to 90 days. *Id.* at 698, 121 S.Ct. 2491. The Court stated, "We have reason to believe ... that Congress previously doubted the constitutionality of detention for more than six months." *Id.* at 701, 121 S.Ct. 2491. Therefore, the Court identified three periods of time relevant to an alien's detention pending removal: (1) the initial 90–day mandatory detention period provided for in 8 U.S.C. § 1231(a)(1)-(2); (2) an additional 90–day period in which detention is presumptively reasonable; and (3) any additional period after the first six months of detention during which the government must rebut with sufficient evidence a

showing by the alien "that there is no significant likelihood of his removal in the reasonably foreseeable future." *Id.* In the context of the third period, the Court stated that what constitutes the "reasonably foreseeable future" shrinks as the total period of postremoval confinement grows. *Id.*

### b. *Ali v. Ashcroft* Injunction: Removal in Light of Conditions in Somalia

Subsequent to the *Zadvydas* decision, five Somali nationals petitioned the United States District Court for the Western District of Washington to enjoin their removal to Somalia and to secure their release via writs of habeas corpus. *Ali v. Ashcroft,* 213 F.R.D. at 397. The petitioners later amended their petition to request the injunctive relief on behalf of a class of aliens. *Id.* On January 17, 2003, the district court ordered three of the five plaintiffs released and permanently enjoined ICE from removing to Somalia any person in the following class:

> All persons in the United States who are subject to orders of removal, expedited removal, deportation or exclusion to Somalia that are either final or that one or more of Respondents believe to be final, excluding any person with a habeas petition pending, or on appeal, raising the issue of unlawful removal to Somalia under 8 U.S.C. § 1231(b).

*Id.* at 396. Citing the Supreme Court's *Zadvydas* decision, the district court ordered the release of the individual petitioners because it found "no evidence to suggest that conditions in Somalia are likely to change in the near future" leaving "no significant likelihood of [their] removal in the reasonably foreseeable future." *Id.* at 411. The Ninth Circuit Court of Appeals affirmed this decision. *Ali v. Ashcroft,* 346 F.3d 873 (9th Cir.2003), *opinion with-*

*drawn on denial of reh'g,* 421 F.3d 795 (9th Cir.2005), *as amended on rehearing* (Oct. 20, 2005).

The U.S.Code section referenced in the *Ali* class definition, 8 U.S.C. § 1231(b), provides that when an alien is ordered removed from the United States, the Secretary of Homeland Security (Secretary) shall, first, attempt to remove the alien to a country designated by the alien (if the alien is a native, citizen, subject, or national of, or has resided in that country) unless the alien fails to promptly designate such a country, the country fails to notify the Secretary of its acceptance of or refuses to accept the alien, or the Secretary decides such removal is prejudicial to the United States. 8 U.S.C. § 1231(b)(2). If one of the exceptions listed bars removal to the country of the alien's choice, the Secretary shall, second, attempt removal of the alien to a country where the alien is a subject, national, or citizen unless the country selected fails to notify the Secretary of its acceptance of or refuses to accept the alien. *Id.* If removal still cannot be accomplished, the Secretary shall, third, remove the alien to any of several categories of countries, including the "country in which the alien was born." *Id.*

### c. *Jama v. ICE*

On January 12, 2005, in *Jama v. ICE,* the United States Supreme Court decided "whether the [Secretary] was precluded from removing [an alien] to Somalia under the third step [set forth in 8 U.S.C. § 1231(b)(2) ] ... because Somalia had not given its consent" to the alien's removal to that country. 543 U.S. 335, 125 S.Ct. 694, 700, 160 L.Ed.2d 708 (2005). The alien petitioner in *Jama* was born in and was a citizen of Somalia. *Id.* at 697. He argued that since Somalia has no functioning government it could not consent to his removal and the Secretary "was barred from removing him to Somalia absent such ad-

vance consent." *Id.* at 698. The Court disagreed and found that [§ 1231(b)(2)'s] third step does not require acceptance by the destination country before removal to that country can be effectuated. *Id.* at 700. The Court also stated that if the Secretary needed to have the permission of the destination country before removing the alien, "the alien [would be] left in the same removable-but-unremovable limbo as the aliens in *Zadvydas v. Davis,* ... and under the rule announced in those cases [would] presumptively be released into American society after six months." *Id.* at 703, 121 S.Ct. 2491.

### d. *Ali v. Ashcroft* Remand

On August 26, 2005, in light of the Supreme Court's *Jama* decision and upon petition by the government, the Ninth Circuit revisited its affirmation of the decision enjoining ICE from removing aliens to Somalia. *Ali v. Gonzales,* 421 F.3d 795 (9th Cir.2005), *as amended on rehearing* (Oct. 20, 2005). The court found that "Jama ... foreclosed the claim that the government may not remove aliens to Somalia." *Id.* at 796. The court also found that the Supreme Court's decision in *Rumsfeld v. Padilla,* 542 U.S. 426, 124 S.Ct. 2711, 159 L.Ed.2d 513 (2004), which held that the proper respondent in a habeas proceeding challenging detention as an enemy combatant was the warden of the detention facility and not the Attorney General, required further consideration of the class of aliens certified by the district court. *Id.* Thus, the Ninth Circuit withdrew its affirmation of the district court injunction and remanded the case "with instructions to vacate the injunction and to reconsider the class certification in light of the Supreme Court's decision in *Padilla.*" *Id.* at 797. The Ninth Circuit, however, expressly rejected the government's request to also vacate the district court's

order releasing three of the Somali nationals in that case because "despite the government's assurances to the contrary, it has not been successful in removing [the alien in *Jama* ]." *Id.*

On October 11, 2005, the United States petitioned the Ninth Circuit for a panel rehearing of its August 26, 2005 decision to modify a footnote in the decision. *See* Petitioners' Motion to Modify Class Notice at 2, Doc. No. 137 in *Ali v. Gonzales,* No. C02–2304P (W.D.Wash.) (motion filed Dec. 12, 2005). The Ninth Circuit granted the request and, on October 20, 2005, amended its opinion. *Id.* As of the date of this Report and Recommendation, no "mandate" has issued from the Ninth Circuit as defined in Federal Rule of Appellate Procedure 41.[4] The petitioner in that case represents: "The mandate will issue from the Ninth Circuit any day now, as both the forty-five day period under Federal Rule of Appellate Procedure (FRAP) 40(a)(1) for seeking a rehearing of the Ninth Circuit's October 20, 2005 order and the seven day period under FRAP 41(b) for the issuance of the Ninth Circuit's mandate have now expired." *Id.* The United States in that action contends that a new class notice "should be posted by [the District Court for the Western District of Washington] after the Ninth Circuit issues its mandate and [the district court] has entered an order in compliance with the mandate." *See* Respondent's Opposition to Petitioners' Motion to Modify Class Notice at 2, Doc. No. 143 in *Ali v. Gonzales,* No. C02–2304P (W.D.Wash.) (brief filed Jan. 9, 2006).[5]

4. Federal Rule of Appellate Procedure 41 provides:

(a) *Contents.* Unless the court directs that a formal mandate issue, the mandate consists of a certified copy of the judgment, a copy of the court's opinion, if any, and any direction about costs.

(b) When Issued. The court's mandate must issue 7 calendar days after the time to file a petition for rehearing expires, or 7 calendar days after entry of an order denying a timely petition for panel rehearing, petition for rehearing en banc, or motion for stay of mandate, whichever is later. The court may shorten or extend the time.

(c) *Effective Date.* The mandate is effective when issued.

(d) Staying the Mandate.

(1) On Petition for Rehearing or Motion. The timely filing of a petition for panel rehearing, petition for rehearing en banc, or motion for stay of mandate, stays the mandate until disposition of the petition or motion, unless the court orders otherwise.

(2) Pending Petition for Certiorari.

(A) A party may move to stay the mandate pending the filing of a petition for a writ of certiorari in the Supreme Court. The motion must be served on all parties and must show that the certiorari petition would present a substantial question and that there is good cause for a stay.

(B) The stay must not exceed 90 days, unless the period is extended for good cause or unless the party who obtained the stay files a petition for the writ and so notifies the circuit clerk in writing within the period of the stay. In that case, the stay continues until the Supreme Court's final disposition.

(C) The court may require a bond or other security as a condition to granting or continuing a stay of the mandate.

(D) The court of appeals must issue the mandate immediately when a copy of a Supreme Court order denying the petition for writ of certiorari is filed.

5. This Court takes judicial notice of these filings in the *Ali* case. *Hart v. Comm'r,* 730 F.2d 1206, 1208 (8th Cir.1984) (per curiam) ("[F]ederal courts may sua sponte take judicial notice of proceedings in other courts if they relate directly to matters at issue.") The Court recognizes that these filings do not establish facts as would an adjudication of those filings and that the facts are not of the type contemplated by Federal Rule of Evidence 201(b). But the Court does not cite these documents as facts other than to indicate that, procedurally, the parties in *Ali* agree that the next step in that case is a mandate from the Ninth Circuit followed by action at the district court level responding to that mandate.

## II. PARTIES' POSITIONS

In response to the Court's Order to show cause (Doc. No. 2), the United States filed an eight-page brief in which it contends that the petition for a writ of habeas corpus should be dismissed because Petitioner is "still well within the permissible detention period under governing statutes and law." (Doc. No. 5 at 1.) The United States agrees that Petitioner "was subject to an administratively final order of removal as of December 16, 2004." (*Id.* at 3.) But, according to the United States, Petitioner was covered by the nationwide injunction and that injunction tolled (and, perhaps, continues to toll) the commencement of the removal period as defined by 8 U.S.C. § 1231(a)(1)(B)(ii) ("If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order"). (*Id.* at 4–5.) The United States argues that, at the earliest, the removal period began on August 26, 2005 when the Ninth Circuit issued its opinion which ordered that the nationwide injunction be vacated. (*Id.* at 7 n. 1.) At the time it filed its return, the United States represented that the August 26, 2005 start date would have placed Petitioner within the first 90 day period (i.e., the statutory removal period) discussed by *Zadvydas* during which detention is mandatory and presumptively reasonable. (*Id.*)

In its five-page response brief, Petitioner argues that the United States' position that the removal period has yet to begin fails for three reasons. First, Petitioner asserts that the United States' position here contradicts the position the United States "has argued in litigation across the country that the Supreme Court's recent decision in *Jama v. ICE,* 543 U.S. 335, 125 S.Ct. 694, 160 L.Ed.2d 708 (2005), eliminates the class action prohibition created by *Ali* on removal to Somalia." (Doc. No. 8 at 2.) Second, Petitioner argues that "[i]t is by no means automatic that someone whose [ICE] custody began after the class action was issued in *Ali* would be included," within the class, a position that, according to Petitioner, the United States "has repeatedly argued in previous litigation in this district" (*Id.* at 2–3 & n. 1) (citing the government's position in *Ahmed Ali v. Mark Cangemi,* Civ. No. 03–3189 (DWF/JSM)). Finally, Petitioner argues that the United States' tolling stance "has been rejected by other courts in this district, and has never been successful." (*Id.* at 3.)

Petitioner states, "it is noteworthy that the government has not even attempted to establish that [Petitioner's] removal in the near future is reasonably foreseeable, nor have they described any attempts to secure his removal any time soon." (*Id.* at 4.) Petitioner concludes, "[t]he government must be ordered to comply with the presumptive six month mandate of *Zadvydas* and either deport [Petitioner] (which seems impossible) or release him immediately." (*Id.* at 4–5.)

## III. COURT'S RECOMMENDATION

### A. *Retain Jurisdiction*

While the United States does not contest the Court's jurisdiction to hear this matter, a brief discussion of the Court's jurisdiction may serve to circumscribe the issues now before the Court. Prior to May 11, 2005, 8 U.S.C. § 1252(a)(2)(C) read:

Notwithstanding any other provision of law, no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in section 1182(a)(2) or 1227(a)(2)(A)(iii), (B), (C), or (D) of this title, or any offense covered by section 1227(a)(2)(A)(ii) of this title for which

both predicate offenses are, without regard to their date of commission, otherwise covered by section 1227(a)(2)(A)(i) of this title.

In *INS v. St. Cyr*, the United States, relying in part on the above text, argued to the United States Supreme Court that no court had jurisdiction to entertain petitions for habeas corpus for aliens, like the Petitioner here, who are removable for committing one of the criminal offenses listed in § 1252(a)(2)(C). 533 U.S. 289, 297–98, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). The *St. Cyr* Court stated that "[a]t its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *Id.* at 301, 121 S.Ct. 2271. The Court found that "[i]t necessarily follows that a serious Suspension Clause issue would be presented if we were to accept the INS' submission that the 1996 statutes have withdrawn that power from federal judges and provided no adequate substitute for its exercise." *Id.* at 305, 121 S.Ct. 2271. Thus, in interpreting the above statutory language in the context of the other provisions of the U.S.Code concerning the removal of aliens, the Supreme Court held that the reference to "judicial review" in the statute meant "full, nonhabeas review." *Id.* at 312, 121 S.Ct. 2271. The Court noted that the relevant statutes "[n]either explicitly mention[ed] habeas, or 28 U.S.C. § 2241" and therefore the U.S.Code did not "speak[ ] with sufficient clarity to bar jurisdiction pursuant to the general habeas statute." *Id.* at 313, 121 S.Ct. 2271.

Thereafter, Congress passed the REAL ID Act of 2005, as part of the much broader Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005, Pub.L. No. 109–13, 119 Stat. 231 (May 11, 2005). The REAL ID Act amended 8 U.S.C.

§ 1252(a)(2)(C). That provision, effective May 11, 2005, now reads:

Notwithstanding any other provision of law *(statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title,* and except as provided in subparagraph (D), no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in section 1182(a)(2) or 1227(a)(2)(A)(iii), (B), (C), or (D) of this title, or any offense covered by section 1227(a)(2)(A)(ii) of this title for which both predicate offenses are, without regard to their date of commission, otherwise covered by section 1227(a)(2)(A)(i) of this title.

8 U.S.C. § 1252(a)(2)(C) (text added by the REAL ID Act amendment emphasized). Congress also added the following provision, codified at 8 U.S.C. § 1252(a)(2)(D): "Nothing in subparagraph (B) or (C), or in any other provision of this chapter (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate *court of appeals* in accordance with this section." (emphasis added). In reviewing the legislative history of the REAL ID Act, one court found the above amendments were in specific response to the *St. Cyr* Court's decision:

According to the [Conference Committee Report on the Act, H.R. Conf. Rep. No. 109–72, 151 Cong. Rec. H2813–01 (May 3, 2005), *available at* 2005 WL 1025891 (Committee Report)], *St. Cyr* had the undesirable effect of "allow[ing] criminal aliens to delay their expulsion from the United States for years." *Id.* at H2872. Furthermore, under *St. Cyr,*

"criminal aliens [were] able to begin the judicial review process in the district court, and then appeal to the circuit court of appeals." *Id.* "Criminal aliens thus [could] obtain review in two judicial forums, whereas non-criminal aliens may generally seek review only in the courts of appeals." *Id.* "Not only is this result unfair and illogical," the report noted, "but it also wastes scarce judicial and executive resources." *Id.* "Finally," the report commented, "the result in *St. Cyr* has created confusion in the federal courts as to what immigration issues can be reviewed, and which courts can review them." *Id.* According to the Committee Report, Section 106 of the REAL ID Act "address[es] the anomalies created by *St. Cyr* and its progeny by restoring uniformity and order to the law." *Id.* at H2873.

Thus, Congress has solidified its long-standing effort to ensure that "only the courts of appeals may review removal orders." *Id.* at H2872. As the Committee Report points out, Congress' goal has long been to "abbreviate the process of judicial review of deportation orders and to eliminat[e] the previous initial step in obtaining judicial review" in the district courts. *Id.* (internal citations and internal quotation and alteration marks omitted). According to the report, Section 106 will "give every alien one day in the court of appeals" thereby "satisfying constitutional concerns" because such review is "an 'adequate and effective' alternative to habeas corpus." *Id.* at H2873 (citation omitted). *Enwonwu v. Chertoff,* 376 F.Supp.2d 42, 82 (D.Mass.2005). Despite the above comments, however, the Committee Report also states that the REAL ID Act amendments, "would not preclude habeas review over *challenges to detention that are independent of challenges to removal orders.* Instead, the bill would eliminate habeas

review *only* over challenges to removal orders." (emphasis added.) H.R. Conf. Rep. No. 109–72, 151 Cong. Rec. H2813–01, at H2873.

■ The Court finds that the above REAL ID Act amendments do not work to bar the Court's jurisdiction over the claim Petitioner raises in the present action. Petitioner is not challenging his removal order. In fact, Petitioner never has made such a challenge. He waived his right to appeal the removal order decision to the Bureau of Immigration Appeals (R. at 73) and has not filed a "petition for review" in the court of appeals challenging the removal order as provided in 8 U.S.C. § 1252(a)(2)(D). Instead, Petitioner challenges the lawfulness of his continued *detention* pending his removal by petitioning for a writ of habeas corpus. (Doc. No. 1). "The privilege of the writ of habeas corpus shall not be suspended, unless when in cases of rebellion or invasion the public safety may require it." U.S. Const. art. I, § 9 cl. 2. "[I]t is a cardinal principle of statutory interpretation ... that when an Act of Congress raises 'a serious doubt' as to its constitutionality," courts "first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Zadvydas,* 533 U.S. at 689, 121 S.Ct. 2491 (citations omitted).

The Court finds that its jurisdiction over Petitioner's constitutional claim in which he seeks release pending his removal alone—as opposed to also challenging the underlying administrative removal decision—is not in any way diminished by the statutory scheme before or after the passage of the REAL ID Act because review of such claims does not require the court to touch upon the removal decision in any way that offends either the express text or legislative history of the Act. Further, interpreting the statute otherwise would raise a serious doubt about the constitu-

tionality of the statute in light of the Suspension Clause of the U.S. Constitution. Whether or not the Court grants Petitioner the relief he requests, he will still be subject to removal. His habeas petition is an independent challenge (i.e., it is not dependent on the merits of his removal). Therefore, the Court recommends retaining jurisdiction over Petitioner's claim. The Court's recommendation is in accord with similar determinations made in other courts subsequent to the May 11, 2005 effective date of the REAL ID Act. *See e.g., Fajardo–Lazil v. Attorney Gen.,* 159 Fed.Appx. 378, 379, 2005 WL 3439912, *1 n. 1 (3d Cir.2005) (per curiam) (unpublished) (noting that "[t]he District Court transferred the portion of the habeas petition challenging the final order of removal to this Court to be treated as a petition for review under Section 106(c) of the REAL ID Act of 2005" but "did not transfer the portion of the habeas petition challenging Fajardo's continued detention."); *Baez v. ICE,* 150 Fed.Appx. 311, 312 (5th Cir.2005) (noting that jurisdiction was proper over habeas challenging detention of alien ordered removed and remanding, on October 4, 2005, to the *district* court a habeas petition for entry of judgment in favor of petitioner); *Hernandez v. Gonzales,* 424 F.3d 42, 42 (1st Cir.2005) (sending back to the *district* court a transferred habeas case and stating, "As indicated in the legislative history of the Act, those provisions were not intended to 'preclude habeas review over challenges to detention that are independent of challenges to removal orders.' "); *Kanteh v. Ridge,* Civ. No. 05–313 DWF/AJB, available at 2005 WL 1719217, at *1 n. 1, *7 (D.Minn. June 30, 2005) (Boylan, M.J.) (recommending that the portion of habeas petition "seeking review of his continued detention ... should properly remain with the District Court"), *Report and Recommendation adopted,* 2005 WL 1705526, at *1 (Frank, J.); *Ali v.*

*Cangemi,* Doc. No. 16 in Civ. No. 03–3189, at 18 DWF/SRN (D.Minn. Sept. 21, 2005) (Mayeron, M.J.) (recommending granting release of alien whose sole challenge was to his ICE detention via petition for writ of habeas corpus), *Report and Recommendation adopted,* Doc. No. 20 (D. Minn. April 30, 2004), *Ali v. Cangemi,* 384 F.3d 989, 990 (8th Cir.2004) (per curiam), *vacated as moot on other grounds reh'g en banc,* 419 F.3d 722 (8th Cir.2005); *Jama v. ICE,* Civ. No. 01–1172 JRT/AJB, *available at* 2005 WL 1205160, *1 (D.Minn. May 20, 2005) (ordering release of alien who challenged ICE detention via a petition for writ of habeas corpus).

## B. *Grant Petition*

Given the United States' position that Petitioner's statutory removal period does not begin until the *Ali* Injunction is lifted, there are several determinations the Court must make before it is even appropriate to consider the reasonableness of Petitioner's detention. First, the Court must determine if Petitioner is covered by the *Ali* injunction. Second, if the *Ali* Injunction covers the Petitioner, the Court must decide whether the injunction is dispositive of Petitioner's present claim for release. Specifically, the Court must answer the following question: Is the *Ali* injunction a "stay" as set forth in 8 U.S.C. § 1231(a)(1)(B)(ii) such that it tolls the commencement of the "removal period"? Relatedly, if the removal period only begins when the stay is lifted, has the stay been lifted, and, if so, when? Third, even if Petitioner's detention is now in the third period of removal as established by the *Zadvydas* Court (more than six months from the final removal decision), the Court must adjudge whether Petitioner has shown "that there is no significant likelihood of his removal in the reasonably foreseeable future" such that the United

States must rebut Petitioner's presumptive release. Finally, if Petitioner has made such a rebuttable showing, the Court must determine if the United States has rebutted Petitioner's presumptive release. The Court takes up each of these issues below.

### 1. Scope of the Ali Action

■ Despite the stance the government may have taken towards the application of the *Ali* Injunction in the habeas actions of other aliens, the Court finds that Petitioner here is within the class as defined by the *Ali* court. To be in the class, Petitioner must be subject to a final removal order that if executed would see him sent back to Somalia and not have had a habeas petition that claimed unlawful detention under 8 U.S.C. § 1231(b) pending or on appeal as of January 17, 2003. *Ali v. Ashcroft*, 213 F.R.D. at 396. Petitioner's removal order reads, "It is HEREBY ORDERED that the respondent be removed from the United States to Somalia ...." Therefore, unless otherwise excepted, Petitioner is within the class defined in *Ali*. While Petitioner does not specifically cite 8 U.S.C. § 1231(b) as the basis for his habeas petition, the Court finds that the substance of his claim—that "it is not likely that he will be removed to Somalia soon in light of the lack of a functioning government in that country"—is one that challenges the order based upon § 1231(b). (*See* Doc. No. 1 at 3.) But Petitioner's removal order was not issued until December 16, 2004 (and his habeas petition filed thereafter) so he does not fall into the exception applying to those with habeas petitions pending or on appeal before January 17, 2003. Therefore, Petitioner is in the class as defined

by *Ali*.[6] *See e.g.*, Doc. No. 16 at 9–12 in *Ali v. Cangemi*, Civ. No. 03–3189 (DWF/SRN) (filed March 30, 2004) (applying the *Ali* Injunction to petitioner residing in this district, subject to removal to Somalia, and with habeas petition filed after January 17, 2003).[7]

### 2. Effect of the Ali Injunction on Petitioner's Claim for Release

■ The United States' argument that the removal period has yet to begin because of the *Ali* Injunction fails for at least six reasons. The Court sets out each reason below.

### a. The Ali Injunction is not a "stay" based upon the plain meaning of 8 U.S.C. § 1231(a)(1)(B)(ii)

The *Ali* injunction is not a "stay" of the type contemplated by the plain meaning of 8 U.S.C. § 1231(a)(1)(B)(ii). That statute provides that the "removal period" commences with "the date of the court's final order" where "the removal order is judicially reviewed and if a court orders a stay of the removal." *Id.* The text refers to a stay lasting a determinable time period— the time during which a court might have reviewed Petitioner's removal order itself. But here, Petitioner waived his right to challenge the removal order at the administrative level. (R. 73.) In fact, nothing in the record suggests Petitioner challenged his removal order in any venue, administrative or judicial. The injunction the United States relies on in support of its tolling argument issued nearly two years before Petitioner was ordered removed by

---

6. The Ninth Circuit did remand the *Ali* decision to the district court in that case "to reconsider the class certification in light of the Supreme Court's decision in *Padilla*." *Ali v. Gonzales*, 421 F.3d 795, 797 (9th Cir.2005). But, to date, the district court has not issued a

decision addressing the remand direction and the class as defined on January 17, 2003 remains the operative class.

7. See herein, footnote 8, for further explanation of the subsequent history of this case.

ICE. On December 16, 2004, neither Petitioner nor ICE were awaiting a *judicial* event (decision) to issue from the Western District of Washington. The removal decision had already issued on January 17, 2003 and a permanent injunction was in place. The event that needed to occur to lift the injunction was that a central government in Somalia be recognized by the United States. The text of the statute does not support delaying the commencement of the "removal period" pending the indeterminable execution of a non-judicial event. *See e.g., Roble v. Pontesso*, 90 Fed. Appx. 334, 337 n. 5, *available at* 2004 WL 363478, *2 n. 5 ("We reject the [Department of Homeland Security's] argument that the permanent injunction in the Ninth Circuit [i.e., the *Ali* injunction] tolls the six-month period.") [8]

### b. The legislative history of 8 U.S.C. § 1231(a)(1)(B)(ii) does not support the United States' interpretation of that provision

To the extent that the text of 8 U.S.C. § 1231(a)(1)(B)(ii) is ambiguous as to what constitutes a "stay," the legislative history of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) makes clear that Congress did not intend to stay the start of the "removal period" under the circumstances present here. In discussing the relevant text, the House of Representatives' Conference Report on the IIRIRA indicates, "This removal period shall begin when the alien's order is administratively final, when the alien is released from non-immigration related detention or confinement, or, if *the* alien has appealed *his order* to a court and

removal has been stayed, *the date of the court's final order.*" H.R. Conf. Rep. No. 2202, 142 Cong. Rec. H10841–02, at H10896, *available at* 1996 WL 539315. (emphasis added.) The Report's language demonstrates that the stay contemplated is one where the petitioner appeals his removal order and the reviewing court issues a judicial stay of the execution of that removal order pending the court's final decision. These are not the circumstances present in this case and the Court finds that the *Ali* injunction did not toll the beginning of the "removal period" as defined by 8 U.S.C. § 1231(a)(1)(B)(ii).

### c. The statutory scheme requires individualized consideration of a request for a stay of the removal period

Had Petitioner requested a permanent injunction similar to the one at issue in *Ali* shortly after the final removal order issued, the Court might have determined that he should be released, just as the *Ali* court in the Western District of Washington did with three of the five petitioners in that case. This potential result underscores the need to consider the stay set forth in 8 U.S.C. § 1231(a)(1)(B)(ii) as one specific to the alien who is the subject of each particular removal order and demonstrates why an unjust result would follow from treating the *Ali* Injunction as a stay of Petitioner's removal order pending further judicial review.

### d. The *Ali* Injunction is not the type of stay contemplated by the statutory scheme

The *Ali* injunction does not go to the merits of Petitioner's removal; it address-

8. Prior to its vacation as moot—because ICE inadvertently released the petitioner while the decision was under consideration for rehearing en banc—at least one panel opinion of the Eighth Circuit affirmed a release of a member of the *Ali* class despite the presence of the *Ali* Injunction. *Ali v. Cangemi*, 384 F.3d 989, 990 (8th Cir.2004) (per curiam), *vacated as moot on reh'g en banc*, 419 F.3d 722 (8th Cir.2005). The Court, while aware of the vacated opinion, has not afforded it any weight given its subsequent vacation.

es the statutory scope (within the constitutional bounds set in *Zadvydas*) of the Attorney General's (non-discretionary) authority to execute removal orders. At least at the time the injunction issued in 2003, this type of injunction was not the type of stay contemplated by 8 U.S.C. § 1231(a)(1)(B)(ii).

### e. The REAL ID ACT of 2005 superceded the injunctive authority of the district court and therefore the *Ali* Injunction has been lifted as of May 11, 2005

█ To the extent that, as the United States contends, (1) Petitioner stands in the shoes of the petitioners in *Ali,* (2) the injunction entered there addresses the *merits* of Petitioner's removal order, and (3) the injunction is construed to be a "stay" pending judicial review, the Court finds that the application of the REAL ID ACT removed from the Western District of Washington the authority to hear any subsequent attack on the removal order itself. As of the effective date of the REAL ID Act, May 11, 2005, the district court's authority to enjoin an action pending review of the *merits* of a removal order based on the crimes identified in 8 U.S.C. § 1252(a)(2)(C) was superceded by statute. All cases challenging removal orders pending in the federal district courts were to be transferred to the *court of appeals* for that district as of May 11, 2005:

> If an alien's case, brought under section 2241 of title 28, United States Code, and challenging a final administrative order of removal, deportation, or exclusion, is pending in a district court on the date of the enactment of this division, then the district court shall transfer the case (or the part of the case that challenges the order of removal, deportation, or exclusion) to the court of appeals for the circuit in which a petition for review could have been properly filed under section 242(b)(2) of the Immigration and

Nationality Act (8 U.S.C. 1252), as amended by this section, or under section 309(c)(4)(D) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1101 note). The court of appeals shall treat the transferred case as if it had been filed pursuant to a petition for review under such section 242, except that subsection (b)(1) of such section shall not apply.

Real ID Act of 2005 § 106(c), Pub.L. No. 109–13, 119 Stat. 231 (May 11, 2005). Thereafter, pursuant to 8 U.S.C. § 1252(a)(2)(D), only the Ninth Circuit could have enjoined Petitioner's removal and it would have had to expressly acted to do so. Service of a habeas petition does not stay removal proceedings unless the court directs otherwise. 8 U.S.C. § 1252(b)(3)(B). There is no Ninth Circuit stay that bears on Petitioner's removal. To the extent the *Ali* Injunction had the effect of tolling the commencement of the removal period pursuant to 8 U.S.C. § 1231(a)(1)(B)(ii), which is doubtful to begin with, the "removal period" would have begun on May 11, 2005, approximately eight months ago. Therefore, even if the injunction was a stay envisioned by 8 U.S.C. § 1231(a)(1)(B)(ii), Petitioner's detention would now be in the third period of removal described by the *Zadvydas* Court during which the government must rebut with sufficient evidence a showing by the alien "that there is no significant likelihood of his removal in the reasonably foreseeable future." 533 U.S. at 701, 121 S.Ct. 2491.

### f. Even If the removal period has not yet begun, *Zadvydas* mandates either construing the pre-removal detention authority to avoid constitutional doubt or a declaration that the pre-removal statute is unconstitutional

█ Finally, even if the *Ali* Injunction serves to toll the statutory "removal peri-

od," the Court finds that the same constitutional concerns raised in the Supreme Court's *Zadvydas* decision apply to the pre-"removal period" under the unique circumstances presented in this case. If Petitioner is not being detained pursuant to the post-removal-period detention authority set forth in 8 U.S.C. § 1231(a)(6), then he is being detained pursuant to the pre-removal detention authority set forth in 8 U.S.C. § 1226. The Court finds that the government's contention that the 90–day removal period has not yet begun is inconsistent with its statement that Petitioner "is *still within* the first *Zadvydas* period." (Doc. No. 5 at 6 (emphasis added.)) Under 8 U.S.C. § 1231(a)(1)(B), the 90–day removal period does not begin if a stay is in place. To the extent the *Ali* Injunction is a stay of the sort contemplated by 8 U.S.C. § 1231(a)(1)(B)(ii), Petitioner would not be "within" the statutory removal period at all because the statutory removal period would have not yet begun; his detention would not be authorized by § 1231 but by § 1226 which covers pre-removal period detention.

In *Demore v. Kim,* the Supreme Court held that the "detention of deportable criminal aliens *pending their removal proceedings* " served "the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings." 538 U.S. 510, 527–28, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003). The Court held the *Zadvydas* scheme inapplicable because "[d]etention during removal proceedings is a constitutionally permissible part of that process." *Id.* at 531, 123 S.Ct. 1708. The *Demore* Court found the facts present in *Zadvydas* to be "materially different" from those in *Demore* for two reasons: (1) the detention in *Demore* was "reasonably relat[ed]" to the purported immigration purpose of the detention; and (2) the detention in *Demore* was not "indefinite" or "potentially permanent." *See*

*id.* at 527–28, 123 S.Ct. 1708 (citations omitted). Unlike the facts presented in *Demore,* Petitioner's detention, if deemed a pre-removal period detention as suggested by the United States, does not materially differ from the facts presented in *Zadvydas* and the same constitutional due process concerns exist here as they did in *Zadvydas.*

First, according to the *Demore* Court, the immigration purpose of pre-removal period detention is "preventing deportable criminal aliens from fleeing prior to or during their removal proceedings." *Id.* at 528, 123 S.Ct. 1708. Here, this same goal has already been achieved. ICE has already conducted Petitioner's removal hearing and ordered him deported. Petitioner waived his right to appeal this decision and did not seek judicial review of his removal order.

Second, the *Demore* Court found that "[u]nder § 1226(c), not only does detention have a definite termination point, in the majority of cases it lasts for less than the 90 days we considered presumptively valid in *Zadvydas.*" *Id.* at 529, 123 S.Ct. 1708.˙ The Court determined that the average time for pre-removal period detention was 47 days and that, even where an alien appealed his pre-removal period detention, the appeal took an average of four months. *Id.* The *Demore* Court stated, "In sum, the detention at stake under § 1226(c) lasts roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal." *Id.* at 530, 123 S.Ct. 1708. In the *Demore* case itself, the Court found that the alien had spent six months in pre-removal period detention but this was due in part to a one month continuance granted at the request of the alien. *Id.* at 531 n. 15, 123 S.Ct. 1708. The Court found that the alien's detention did not violate due pro-

cess because, unlike its decision in *Zadvydas* which found that post-removal-period detention "has no obvious termination point," "detention pending a determination of removability" is definite. *Id.* at 529, 123 S.Ct. 1708.

Assuming the United States is correct and that, to date, Petitioner has only been held in pre-removal period detention, Petitioner has been civilly detained for more than a year with, at a bare minimum, up to another 90–days of removal period detention ahead of him commencing when the United States determines that the removal period commences—presumably when the *Ali* Injunction is formally lifted. As the *Demore* Court stated, "It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings. At the same time, however, ... detention during deportation proceedings" is "a constitutionally valid aspect of the deportation process." *Id.* at 523, 123 S.Ct. 1708. As noted above, this Court takes the position that Petitioner's removal period commenced on May 11, 2005. The United States asserts the period has yet to begin. (Doc. No. 5 at 6–7.) To date, no official mandate has issued from the Ninth Circuit concerning the *Ali* Injunction and the *Ali* Injunction remains in place. To the extent the United States argues that the pre-removal period detention is about to end, the constitutional concerns raised by Petitioner's thirteen months of pre-removal period civil detention are not ameliorated. *See Demore*, 538 U.S. at 532, 123 S.Ct. 1708 (Kennedy, J., concurring) ("[S]ince the Due Process Clause prohibits arbitrary deprivations of liberty, a lawful permanent resident alien ... could be entitled to an individualized determination as to his risk of flight and dangerousness if the continued detention became unreasonable or unjustified.... Were there to be an unreasonable delay by the INS in pursuing and completing deportation proceed-

ings, it could become necessary then to inquire whether the detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons.") At the very least, the Court finds that the period of pre-removal period detention exceeding the upper range contemplated by the *Demore* Court (six months), must be added to any additional anticipated detention when considering whether Petitioner's release is warranted under the third leg of the *Zadvydas* analysis. 533 U.S. at 701, 121 S.Ct. 2491. Petitioner has been detained for a total of thirteen months, seven months longer than the maximum pre-removal detention period contemplated by the *Demore* Court. The government does not suggest it has a plan in place for removing Petitioner to Somalia or a timetable for his removal. The Court finds that, in the absence of any plan or timetable for removal, and given his already seven months of detention by ICE beyond that deemed reasonable by the *Demore* Court, even if Petitioner can be said to be in pre-removal detention—a position this Court does not accept—the Court finds that his release is warranted.

In sum, the *Demore* Court justified the legality of a lack of due process for criminal aliens "pending a determination of removability" because the detention was reasonably related to the immigration purpose (the removal determination) and because the detention was of a fixed period of time ranging from a month to six months. 538 U.S. at 527–28, 123 S.Ct. 1708. These justifications are not present here. Further pre-removal period detention does not serve its immigration purpose, as identified by the Supreme Court, of making sure Petitioner arrives at his removal hearing and that a determination may issue. Petitioner was detained. He was produced for his hearing and a final determination is-

sued on December 16, 2004. Finally, Petitioner's detention has not concluded within the limited range set forth by the Supreme Court and its end is by no means definite. Thus, even if the *Ali* Injunction stayed the commencement of the statutory removal period, application of the *Zadvydas* regimen is appropriate.

### 3. *Initial Showing of No Significant Likelihood of His Removal in the Reasonably Foreseeable Future*

■ Under the *Zadvydas* Court's tripartite removal analysis, a petitioner must "provide[ ] good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future" before the United States is required to respond by showing why that belief is unfounded. *Id.* at 701, 121 S.Ct. 2491. Petitioner states that his removal is unlikely "in light of the lack of a functioning government in [Somalia]." (Doc. No. 1 at 3.)

Petitioner also cites to a recent opinion issued by the Honorable District Court Judge John R. Tunheim in *Jama v. ICE,* Civ. No. 01–1172 JRT/AJB, *available at* 2005 WL 1205160 (D.Minn. May 20, 2005) as support for his position that his removal is unlikely anytime soon because of the political conditions in Somalia. This most recent *Jama* opinion came in the wake of the Supreme Court's January 12, 2005 denial of Keyse G. Jama's habeas petition in *Jama v. ICE,* 543 U.S. 335, 125 S.Ct. 694, 700, 160 L.Ed.2d 708 (2005), discussed above. In Judge Tunheim's subsequent decision, the court considered—in light of the Supreme Court's decision that the removal of Jama did not require acceptance by Somalia before removal to Somalia could be effectuated—a renewed habeas petition brought by Jama in which he again sought release from ICE detention. *Id.* at *1.

The facts relevant to Jama's renewed petition are as follows. On April 12, 2005, ICE presented to the court "an affidavit representing that a plan had been finalized and would be carried out by April 25, 2005." *Id.* Judge Tunheim found the plan lacked sufficient detail and ordered the United States to provide a more detailed plan. *Id.* ICE provided an "apparently concrete and detailed ... plan" which involved sending Jama to Puntland, an autonomous region in Somalia, in the custody of a private security firm which was to transfer Jama to Puntland officials who had agreed to accept him. *Id.* at *1–2. Based on these representations, Judge Tunheim "determined that Jama's deportation would indeed take place in the reasonably foreseeable future and thus permitted the plan to proceed." *Id.* at *1. On April 20, 2005, ICE transported Jama to Somalia but failed to deport Jama. *Id.* at *2. ICE reported to Judge Tunheim "that Jama had been denied entry to Puntland because he did not have appropriate identification and documentation of his circumstances." *Id.* According to the court, "the government apparently refused to provide Jama with any identification other than the warrant and order for his removal," and even after the failed attempt at deportation, maintained this position. *Id.* at *5. Puntland officials apparently "were concerned that Jama could not establish that he was a citizen of Puntland or, indeed, Somalia." *Id.* "Jama does not have any identification or documentation dating from before his family fled Somalia." *Id.*

After reviewing the failed removal attempt, the court stated, "The Court notes again that deportation to Somalia is neither easily arranged nor easily executed and may well be impossible. This has been more than amply demonstrated by the government's several unsuccessful attempts to piece together a deportation plan over the years and by the recent

failed and dangerous attempt."[9] The court also found that:

> In their haste to deport Jama, ICE and its agents surely mishandled the attempt and caused a situation which could easily have turned deadly. ICE's repeated glib assurances to the Court that "everything was in order for the deportation" turned out to be nothing more than boastful assertions without much factual basis.... The unwillingness of the United States to deal directly with [regional officials in Somalia] suggests that fruitful negotiations are not likely to occur any time soon.... In fact, even ICE has acknowledged that it may well be impossible to successfully deport Jama or any of the other Somalis subject to deportation.

*Id.* at *4. Further, the court found "that decision making channels in the region remain so ill-defined that the assurances of any one official mean little to nothing." *Id.* at *5. The court found "that Jama is not likely to be removed in the reasonably foreseeable future and must therefore be released, subject, of course, to any appropriate conditions." *Id.* at *7. Thus, the court granted Jama's petition for writ of habeas corpus. *Id.* at *8.

The Court finds that Petitioner's citation to ICE's recent failed efforts to deport the alien in *Jama* "provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Zadvydas*, 533 U.S. at 701,

121 S.Ct. 2491. *See also Ali v. Gonzales*, 421 F.3d at 797 (refusing to vacate the district court's order releasing three Somalis because "despite the government's assurances to the contrary, it has not been successful in removing Mr. Jama" in the *Jama v. ICE* case).

### 4. Government's Rebuttal of Petitioner's Showing of Good Reason

■ The United States does not contest Petitioner's showing of "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* Therefore, the Court concludes that the United States has not rebutted the presumption in favor of Petitioner's release. The Court is cognizant that some of the factors that led Judge Tunheim to release Keyse G. Jama may not be present in this case. But, without any comment by the government, the Court will not presume such rebutting facts to be present nor would it be permissible to do so under the *Zadvydas* scheme. Given the procedural history of his case, Jama is perhaps the most visible of any of the numerous Somalis facing removal to Somalia. The United States, to date, has been unsuccessful in removing him to Somalia. In the absence of any evidence to suggest that Petitioner's removal in the reasonably foreseeable future is any more likely than that of Jama, the Court finds there is no significant likelihood of such removal. Nor does Petitioner's record suggest that his supervised release would

---

9. A footnote in the opinion states:

The private contractors accompanying Jama apparently reported to the government that approximately twenty armed men surrounded the plane, some of which identified themselves as immigration officials. According to Jama, four unarmed men approached the plane. The Court finds this discrepancy immaterial to the current motion, but notes that Jama's version is more consistent with the government's position

that Puntland, Somalia is sufficiently stable and functional to be considered an appropriate, humane destination for deportable persons while the contractors' version supports the view that Puntland remains so lawless and dangerous as to make deportation to the area impossible to accomplish. *Jama v. ICE*, Civ. No. 01–1172 JRT/AJB, *available at* 2005 WL 1205160, *3 n. 5 (D.Minn. May 20, 2005).

pose a serious threat to the nation or local community or otherwise justify further civil detention. The government's silence in the face of these findings means Petitioner must be released subject to such terms and conditions as may be necessary to ensure that Respondents will be kept apprised of his whereabouts. *Zadvydas,* 533 U.S. at 701, 121 S.Ct. 2491.

Based upon the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1. Petitioner's Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2241 (Doc. No. 1) be **GRANTED**; and

2. Petitioner be released subject to such terms and conditions as Respondents deem necessary to ensure that Respondents will be kept apprised of Petitioner's whereabouts pending his removal.