Sadou Alious BAH, Petitioner,

v.

Mark CANGEMI, District Director, U.S. Immigration and Customs Enforcement (ICE); Michael Chertoff, Secretary, Department of Homeland Security; Alberto R. Gonzales, United States Attorney General; Eduardo Aguirre, Director, U.S. Citizenship and Immigration Services (CIS), Enforcement (ICE); and Denise M. Frazier, District Director, U.S. Citizenship and Immigration Services (CIS), Respondents.

No. 06–CV–3260 (PJS/JSM).

United States District Court,
D. Minnesota.

May 1, 2007.

Herbert A. Igbanugo and Katie A. De-Grio, Igbanugo Partners Int'L Law Firm, PLLC, for Petitioner.

D. Gerald Wilhelm, Assistant United States Attorney, United States Attorney's Office, District of Minnesota, for Respondents.

## MEMORANDUM OPINION AND ORDER

SCHILTZ, District Judge.

Sadou Bah petitions this Court for a writ of habeas corpus under 28 U.S.C. § 2241, seeking release from the custody of United States immigration officials. Bah also seeks legal authorization to remain in the United States and, toward that end, asks this Court to order that he be granted Temporary Protected Status ("TPS") under 8 U.S.C. § 1254a (§ 244a of the Immigration and Naturalization Act ("INA")). The government opposes Bah's habeas petition and moves to dismiss his TPS-related claims.

Pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72. 1, the parties' motions were referred to Magistrate Judge Janie S. Mayeron, who issued a Report and Recommendation ("R & R") [Docket No. 29] recommending that this Court grant Bah's habeas petition and dismiss his TPS-related claims for lack of jurisdiction. Bah objects to Judge Mayeron's recommendation that his claims relating to his TPS application be dismissed, while the government objects to Judge Mayeron's recommendation that Bah's habeas petition be granted.

The Court has considered the parties' contentions de novo, as required by 28 U.S.C. § 636(b)(1) and Local Rule 72.2(b). The Court agrees with Judge Mayeron that Bah's habeas petition should be granted and that the Court has no jurisdiction over Bah's TPS-related claims. The Court therefore adopts in part Judge Mayeron's R & R and overrules the parties' objections. But because the Court's reasoning differs from Judge Mayeron's in some respects, and because this case raises important and unsettled issues under the immigration laws, the Court will explain its decision at length.

## I. BACKGROUND

Bah was born in Liberia in 1970 and remains a Liberian citizen. Certified Admin. Record vol. 1 at 33 [Docket No. 17 Ex. 1] ("CAR vol. 1"). Bah entered the United States in 1990 on a six-month visa, and he has remained in the United States more-or-less continuously since then. Certified Admin. Record vol. 2 at 8–10, 70–71 [Docket No. 17 Ex. 1] ("CAR vol. 2").[1] Bah married American citizens twice; both marriages ended in divorce. CAR vol. 1 at 33. Bah has an 11–year–old son from one of those marriages. CAR vol. 2 at 3. Each of Bah's former spouses at one point petitioned the United States government to allow Bah to apply for lawful-permanent-resident status, but both petitions were ultimately denied. CAR vol. 1 at 11, 33; Resp't's Mem. Supp. Mot. Dismiss at 1–2 [Docket No. 23].

In 1991, roughly a year after his arrival in the United States, Bah applied for TPS under § 1254a.[2] CAR vol. 2 at 8. The TPS program allows aliens from designated countries—generally countries suffering significant civil strife or distress (such as Liberia in the 1990s)—to live and work in the United States until conditions in their home countries improve.[3] Bah's initial applications were denied, but he persevered and ultimately received TPS in April 1994. *Id.* Bah successfully renewed his TPS throughout the 1990s. *Id.*

In January 1996, Bah left the United States to attend his father's funeral in Senegal. CAR vol. 1 at 16. On his return, Bah was "paroled" into the United States, *id.* at 13–14—that is, he was allowed to enter the country while remaining (in the law's eyes) an applicant for admission. *See* § 1182(d)(5)(A) (INA § 212).

On July 6, 2004, the Bureau of Immigration and Customs Enforcement ("ICE") began removal proceedings against Bah, charging him with being removable under § 1227(a)(1)(B) (INA § 237) as an alien admitted to the United States but not legally authorized to remain here.[4] CAR vol. 1 at 4. Bah was not taken into custody.

That changed on November 24, 2004, when immigration officials took Bah into custody and charged him with being removable on different grounds. The government apparently realized that the basis

1. The record contains conflicting evidence about when Bah entered the United States. *Compare* CAR Vol. 1 at 4, 33 (stating that he arrived on June 25, 1991), *with* CAR Vol. 2 at 70–71 (stating that he arrived in October 1990). Given that Bah was arrested in Hennepin County in December 1990, CAR Vol. 2 at 112, he must have arrived in the United States some time before then.

2. Unless otherwise noted, all citations to a section of a statute are to Title 8 of the United States Code.

3. Liberia will no longer be a TPS-designated country as of October 2007. *See* Termination of the Designation of Liberia for Temporary Protected Status; Automatic Extension of Employment Authorization Documentation for Liberia TPS Beneficiaries, 71 Fed.Reg. 55000 (Sept. 20, 2006).

4. Under the Homeland Security Act of 2002, Pub.L. No. 107–296, 116 Stat. 2135 (codified in scattered sections of 6 U.S.C.), as of March 2003 the functions of the Immigration and Naturalization Service ("INS") were transferred to the Bureaus of Immigration and Customs Enforcement ("ICE") and Citizenship and Immigration Services ("CIS") and the INS was then abolished. *See also Reorganization Plan Modification for the Department of Homeland Security*, H. Doc. No. 108–32, at 3 (2003) (renaming "Bureau of Border Security" the "Bureau of Immigration and Customs Enforcement"), *available at* http://www.gpoaccess.gov/serialset/cdocuments/search.html (search 108th Congress for "108–32"). In general, ICE handles removal of aliens while CIS handles aliens' requests for admission to, or authorization to remain in, the United States (including applications for TPS).

for the July 2004 charge (§ 1227(a)(1)(B)) applies only to admitted aliens, not to paroled aliens like Bah. Thus, the government asserted two new reasons to remove Bah. First, the government asserted that Bah was a garden-variety inadmissible alien under § 1182(a)(7)(A)(i)(I). CAR vol. 1 at 11. Second, the government charged Bah with being an inadmissible criminal alien under § 1182(a)(2)(A)(i)(I), citing Bah's conviction in April 1991 for second-degree criminal sexual conduct with a 9-year-old girl, *id.* at 11, 33, even though that conviction had been vacated in December 1998, CAR vol. 2 at 117, 98. Because of this second charge, the government was required by § 1226(c)(1)(A) (INA § 236) to detain Bah pending his removal proceedings.

Bah's removal proceedings began promptly. On December 2, 2004, he had a hearing before an immigration judge ("IJ"). CAR vol. 1 at 19. The IJ found that Bah was removable as an ordinary inadmissible alien under § 1182(a)(7)(A)(i)(I). The IJ expressly declined to decide whether Bah was a criminal inadmissible alien under § 1182(a)(2)(A)(i)(I). *Id.* At the hearing, Bah—who was represented by counsel—waived his right to appeal the IJ's decision. *Id.*

Soon after the hearing, Bah had second thoughts about his waiver, and he retained new counsel. On December 30, 2004, Bah filed with the IJ a motion to reopen, for reconsideration, and for a stay of removal. CAR vol. 1 at 20–35. Bah asserted in an attached affidavit that he did not put on a defense at the earlier hearing because he felt "intimidated and coerced" and suffered from "deer-in-headlights syndrome." *Id.*

at 33–34. Also on December 30, 2004, Bah appealed the IJ's removal order to the Board of Immigration Appeals ("BIA"). *Id.* at 36–40. On January 10, 2005, the IJ denied Bah's post-hearing motions. *Id.* at 49–50. Bah then appealed that denial to the BIA on February 8, 2005. *Id.* at 51–67.

The BIA dismissed Bah's appeal of the IJ's removal order on May 23, 2005.[5] *Id.* at 73. The BIA found that Bah "made no argument that the decision to waive appeal was not a knowing and intelligent one" and that, because Bah had waived his right to appeal, the BIA had no jurisdiction. *Id.* The BIA was wrong. Bah had indeed argued that his decision to waive his appellate rights was not knowing and intelligent. He did so explicitly in the addendum to his appeal form. *Id.* at 38. Thus the BIA did indeed have jurisdiction.

On June 7, 2005, shortly after the BIA's erroneous decision, ICE issued a warrant directing that Bah be removed from the United States. CAR vol. 1 at 74. By that time, Bah had been in custody for over six months, but immigration proceedings had concluded just a few weeks earlier (on May 23, when the BIA erroneously dismissed Bah's appeal).

Bah petitioned the Eighth Circuit for review of the BIA's order on June 22, 2005, and on August 11, 2005, he also asked the Eighth Circuit to issue a stay of removal. Docket Report, *Bah v. Gonzales,* No. 05–2734 (8th Cir.). The Eighth Circuit denied Bah's request for a stay on September 7, 2005. *Id.* Bah remained in custody awaiting the Eighth Circuit's decision on his petition for review.

On August 24, 2005, an ICE officer reviewed Bah's custody status. CAR vol. 1

---

5. Although the government asked the BIA to dismiss both Bah's appeal of the IJ's initial order of removal and Bah's appeal of the IJ's later denial of his motion to reopen, CAR vol.

1 at 68–69, the BIA's May 23 order addressed only the former appeal, and said not a word about the latter appeal.

at 81–87. The officer noted that Bah had provided his passport to ICE and was scheduled to be removed in September 2005 via a flight on the Justice Prisoner and Alien Transportation System, a government-run airline for transporting detainees and prisoners. *Id.* at 84, 87. The officer observed: "Due to the fact that [Bah] will be removed *prior to the 180 day mark*, his continued detention is recommended. When faced with the reality of removal, [Bah] may become a flight risk." [6] *Id.* at 87 (emphasis added). The officer's reference to "the 180 day mark" demonstrated his awareness that, as will be discussed at length below, the government cannot indefinitely detain an alien pending removal.

Bah was not removed in September 2005, apparently because Liberia had not issued the necessary travel documents. Six months later, in a document dated April 20, 2006, ICE explained to Bah that it had again reviewed his custody status and again decided not to release him. CAR vol. 1 at 77. According to that document:

A request for a travel document was submitted to the Liberian Embassy and the process to verify your identity is ongoing. The government of Liberia regularly issues documents to effect the repatriation of its nationals. There is no indication at this time that a certificate will not be issued for your repatriation. *Id.*

Bah did not sit by idly while the Eighth Circuit considered his challenge to the BIA's decision affirming the IJ's removal order. While waiting for word from the Eighth Circuit, Bah actively pursued TPS. Bah formally applied for TPS in February 2005. CAR vol. 2 at 1. Bah's application was approved on June 21, 2005. *Id.* at 2.

On July 15, 2005, however, CIS notified Bah that it intended to withdraw approval of his TPS. *Id.* at 11–13. CIS was true to its word; on September 13, CIS issued a new decision rejecting Bah's TPS application. *Id.* at 8–10. CIS determined that Bah's 1991 conviction for second-degree criminal sexual conduct rendered him ineligible for TPS under § 1254a(c)(2)(B)(i) and 8 C.F.R. § 244.4, despite the fact that, as noted above, the conviction had been vacated in 1998. CAR vol. 2 at 8–10. CIS took the position that Bah's conviction had been vacated solely to improve his immigration status. *Id.* at 9–10. Under *In re Pickering*, 23 I. & N. Dec. 621, BIA Interim Decision 3493 (BIA 2003), immigration officials disregard such a vacatur and treat the underlying conviction as valid for immigration purposes.[7]

In October 2005, Bah appealed CIS's denial of TPS to the Administrative Appeals Office ("AAO"). CAR vol. 2 at 17–19, 35–51. The AAO dismissed Bah's appeal on January 18, 2006. *Id.* at 52–59. Undeterred, Bah applied again for TPS in late March 2006. *Id.* at 60–69. In July 2006, CIS denied Bah's new TPS application for the same reasons that it had denied his February 2005 application and for

---

**6.** The officer's assessment that Bah was a flight risk appears to have been based on a generalization about aliens "faced with the reality of removal," and not on any individualized determination about Bah.

**7.** The Sixth Circuit reviewed the BIA's decision in *Pickering* and agreed that immigration officials may "count" a conviction that was

vacated solely to help the defendant remain in the United States. The Sixth Circuit held, though, that the government bears the burden of demonstrating, by clear and convincing evidence, that a vacated conviction should nevertheless "count" for immigration purposes. *Pickering v. Gonzales,* 465 F.3d 263, 269 (6th Cir.2006).

the additional reason that this March 2006 application was untimely. *Id.* at 144–45. Bah did not appeal that denial.

During the entire time that he was pursuing TPS, Bah was waiting for the Eighth Circuit to rule on his petition for review of the BIA order affirming the IJ's original removal order. His wait ended on August 9, 2006, when the Eighth Circuit issued a brief per curiam decision granting Bah's petition and remanding his case to the BIA. *Bah v. Gonzales,* 457 F.3d 838 (8th Cir.2006). The Eighth Circuit held that, contrary to the BIA's finding, Bah *did* argue to the BIA that his appeal waiver was not knowing and voluntary. The Eighth Circuit directed the BIA, on remand, to determine the validity of Bah's appeal waiver. *Id.*

Just before the Eighth Circuit issued its decision, Bah petitioned this Court on August 7, 2006, for a writ of habeas corpus and for some form of relief related to his failed effort to receive TPS. The case was referred to Magistrate Judge Janie S. Mayeron. At Judge Mayeron's direction, Bah consolidated his requests for relief into one amended pleading. Verified Pet. for a Writ of Habeas Corpus Together with Compl. for Declaratory & Injunctive Relief & Compl. for Mandamus to Compel Reinstatement of Approval of TPS Application [Docket No. 20] ("Am. Pet. & Compl.").[8] In that pleading, Bah seeks a writ of habeas corpus directing the government to release him from his current detention. In the same pleading, Bah also asks this Court (by way of a writ of mandamus or some form of injunctive relief) to direct CIS to grant him TPS. The government opposes all of Bah's requests for relief.

On December 21, 2006, Judge Mayeron issued her R & R recommending that this Court grant Bah's habeas petition and dismiss Bah's claims related to TPS for lack of jurisdiction. R & R at 24–25. The government objects to the first recommendation. Resp't's Obj. R & R [Docket No. 30]. Bah objects to the second. Pet'r's Partial Obj. R & R [Docket No. 31].

For its part, the BIA has recently acted in response to the Eighth Circuit's remand order. On February 7, the BIA vacated its original decision, reopened Bah's removal proceedings, and remanded his case to the IJ for further proceedings. *IN RE BAH,* No. A94 214 681, 2007 WL 1154014, slip op. at 2 (BIA Feb. 8, 2007) [Docket No. 33 Ex. 1].

## II. DISCUSSION

### A. *Temporary Protected Status*

█ Turning first to Bah's TPS-related claims: Under § 1254a(c)(2)(B)(i) and 8 C.F.R. § 244.4(a), felony convictions disqualify aliens from receiving TPS. CIS determined that Bah was ineligible for TPS based on his 1991 felony conviction for second-degree criminal sexual conduct. CAR vol. 2 at 9–10. Bah argues that CIS should have disregarded that conviction because it was vacated in 1998. Pet'r's Resp. Resp't's Mot. Dismiss at 6–7 [Docket No. 27]. CIS found, however, that the conviction had been vacated solely to relieve Bah of immigration hardships and therefore that the vacatur was irrelevant for immigration purposes under *In re Pickering,* 23 I. & N. Dec. 621, BIA Interim Decision 3493 (BIA 2003). CAR vol. 2 at 10. This Court cannot review the merits of that decision because, as Judge Mayeron cogently explained (R & R at 5–9),

---

**8.** As Judge Mayeron recommended, R & R at 1 n. 1, the Court will grant Bah's motions for leave to file the amended petition and complaint [Docket Nos. 18 & 25] and will treat his "Verified Petition" [Docket No. 20] as the operative pleading in this matter.

this Court lacks jurisdiction over Bah's TPS-related claims.

According to the INA, if an alien is eligible for TPS, the Attorney General "may"—not "must" or "shall," but "may"—"grant the alien temporary protected status." § 1254a(a)(1)(A). Thus, whether to grant TPS is indisputably committed to the discretion of the Attorney General.

Congress has expressly deprived district courts of jurisdiction to review denials of discretionary relief in immigration cases. According to § 1252(a)(2)(B) (INA § 242) (entitled "Denials of discretionary relief"):

> Notwithstanding any other provision of law (statutory or nonstatutory), including [28 U.S.C. § 2241], or any other habeas corpus provision, and [28 U.S.C. §§ 1361 and 1651], and except as provided in subparagraph (D), and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review
> . . .
>
> > (ii) any other decision or action of the Attorney General . . . the authority for which is specified under this title to be in the discretion of the Attorney General . . . other than the granting of relief under section 208(a) [8 U.S.C. § 1158(a) ].

Congress has spoken clearly. Title 8 of the United States Code has committed the decision whether to grant TPS to the discretion of the Attorney General, and thus, with one exception, neither this Court nor any other federal court has jurisdiction to review the Attorney General's decision to deny TPS. The exception—found in § 1252(a)(2)(D)—cannot help Bah here because, as discussed below, the exception applies only to the courts of appeals, not to the district courts. *See Rodas v. Chertoff,* 399 F.Supp.2d 697, 705–06 (E.D.Va.2005).

Bah argues that § 1252(a)(2)(B) does not apply because CIS's decision to deny him TPS was not discretionary and therefore Bah is not challenging a discretionary decision. Pet'r's Partial Obj. R & R at 3–5. It is true that, under § 1254a(c)(2)(B)(i) and 8 C.F.R. § 244.4(a), once CIS determined that Bah was a convicted felon, it was required to deny his request for TPS. It is also true that CIS's decision to disregard the vacatur of his 1991 conviction was a legal determination, not a factual one. *See* Pet'r's Partial Obj. R & R at 3. But none of this changes the fact that the ultimate decision whether to grant TPS is, by statute, committed to the discretion of the Attorney General, and thus this Court is deprived of jurisdiction to review that decision by § 1252(a)(2)(B).

■ Because of the exception referred to above, Bah does have a means of getting a federal court to review his assertion that the Attorney General made a legal error when it denied him TPS. Section 1252(a)(2)(B) deprives federal courts of jurisdiction to review discretionary decisions in immigration cases "*except* as provided in subparagraph (D)" of § 1252(a)(2). And subparagraph (D) provides:

> Nothing in subparagraph (B) or (C), or in any other provision of this Act (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review *filed with an appropriate court of appeals* in accordance with this section.

§ 1252(a)(2)(D) (emphasis added). Therefore, unlike this Court, the Eighth Circuit has jurisdiction to review Bah's challenges to the Attorney General's denial of TPS.

■ One question remains: Should this Court dismiss Bah's TPS-related claims for lack of jurisdiction or instead transfer them to the Eighth Circuit? This Court

has the authority to transfer the claims by virtue of 28 U.S.C. § 1631, which provides:

Whenever a civil action is filed in a court ... or an appeal, including a petition for review of administrative action, is noticed for or filed with such a court and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed or noticed, and the action or appeal shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court from which it is transferred.

The government suggested such a transfer in its return to Bah's habeas petition, Resp't's Return at 12–14 [Docket no. 17], but the government did not reprise the suggestion in connection with its later-filed motion to dismiss Bah's TPS-related claims, *see* Resp't's Mem. Supp. Mot. Dismiss. Moreover, Bah did not request a transfer before Judge Mayeron. Judge Mayeron recommended against transferring any portion of this action to the Eighth Circuit, citing both Bah's failure to request a transfer and the possibility that his claims may be procedurally barred even if brought in the proper forum. R & R at 9 n. 6.

In objecting to the R & R, Bah has for the first time asked this Court, if it decides that it has no jurisdiction over his TPS-related claims, to transfer those claims to the Eighth Circuit. Pet'r's Partial Obj. R & R at 2. In light of this request and the

government's initial suggestion, and given the importance of the legal question as to how a vacated conviction like Bah's should be treated under the immigration laws, this Court believes that a transfer under § 1631 is warranted. The Court expresses no opinion on the merits of Bah's claims or on whether they are procedurally barred.

### B. Habeas Corpus

■ Turning now to Bah's habeas petition: Bah seeks release from custody, arguing that his continued detention is unlawful under *Zadvydas v. Davis*, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), which held that § 1231 (INA § 241)—the statutory provision governing detention of aliens subject to removal orders—does not authorize *indefinite* detention. *See also Clark v. Martinez*, 543 U.S. 371, 378–79, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005) (holding that the *Zadvydas* analysis applies both to admitted aliens and to aliens seeking admission or paroled under § 1182). Bah further asserts that his continued detention violates his rights to substantive and procedural due process under the Fifth Amendment to the United States Constitution. Am. Pet. & Compl. ¶¶ 67–75. This Court has jurisdiction over Bah's habeas petition under 28 U.S.C. § 2241.[9]

#### 1. Law Governing Civil Detention of Aliens

Two different statutory provisions govern the civil detention of aliens who are involved in immigration proceedings. As this case illustrates, these two provisions can interact in complex ways.

---

9. The government does not dispute the Court's jurisdiction over Bah's habeas petition. Congress amended the immigration laws in 2005 to limit habeas review of removal orders, *see* § 1252(a)(2)(C), but those amendments did not deprive district courts of jurisdiction over habeas challenges to an alien's continued confinement where the alien does not challenge the underlying removal order. *See generally Moallin v. Cangemi*, 427 F.Supp.2d 908, 918–21 (D.Minn.2006) (discussing habeas jurisdiction in immigration cases after REAL ID Act of 2005).

The first provision, § 1226, generally governs detention before and during immigration proceedings. Section 1226(c) requires the government to detain certain criminal aliens and restricts the government's ability to release aliens detained under that section. Section 1226(a) allows the government, at its discretion, to detain all other aliens pending decisions on their removal.

The second provision, § 1231, governs detention of aliens who have been "ordered removed." *Id.* § 1231(a). In other words, while § 1226 generally governs detention *before* and *during* immigration proceedings, § 1231 generally governs detention *after* immigration proceedings. Section 1231(a)(1)(A) defines a 90-day "removal period" during which the government (under § 1231(a)(2)) must detain any alien ordered removed and (under § 1231(a)(1)(A) itself) must remove that alien. The parties have focused their arguments on § 1231 detention.

Because the government may, for various reasons, be unable to remove an alien within 90 days of when an IJ first orders the alien's removal, § 1231 provides three different ways in which an alien's detention can be lawfully extended beyond the 90-day removal period:

*First,* although § 1231(a)(1)(A) directs the government to remove aliens within 90 days after the alien "is ordered removed," § 123 1(a)(1)(B) provides that the 90-day removal period does not actually begin to run when an immigration judge orders an alien's removal. Instead, under § 1231(a)(1)(B):

The [90-day] removal period begins on the latest of the following:

(i) The date the order of removal becomes administratively final.

(ii) If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order.

If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement.

*Second,* even if the 90-day removal period has begun to run under § 1231(a)(1)(B), the period itself will be lengthened under § 1231(a)(1)(C) if the alien frustrates his removal in particular ways:

The removal period shall be extended beyond a period of 90 days and the alien may remain in detention during such extended period if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal.

*Third,* and finally, if the removal period of 90 days—or, if extended under § 1231(a)(1)(C), the removal period of longer that 90 days—has run, the government has discretion under § 1231(a)(6) to detain certain aliens longer:

An alien ordered removed who is inadmissible under [8 U.S.C. § 1182], removable under [8 U.S.C. §§ 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4)] or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3).

The language of § 1231(a)(6) is permissive, not restrictive. Nowhere does the language limit the government's ability to detain aliens after the 90-day removal period has run. In *Zadvydas,* though, the Supreme Court read into the statute a limitation on combined removal-period and post-removal-period detention. To avoid the "serious constitutional concerns" that

would result if § 1231(a)(6) were construed to permit indefinite post-removal-period detention, the Supreme Court "construe[d] the statute to contain an implicit 'reasonable time' limitation, the application of which is subject to federal court review." 533 U.S. at 682, 121 S.Ct. 2491. The Supreme Court went on to hold that it is presumptively reasonable to keep an alien subject to a final removal order in custody for a total of six months. *Id.* at 701, 121 S.Ct. 2491.

Because *Zadvydas* involved a challenge to § 1231(a)(6)—and because § 1231(a)(6) only governs detention *after* the 90–day removal period has run—the Supreme Court had no occasion to consider limits on detention before the running of the removal period or while the removal period is suspended under § 1231(a)(1)(C). Rather, the six-month period of presumptively reasonable detention established in *Zadvydas* consists of the 90–day removal period (which typically begins to run, under § 1231(a)(1)(B), when the alien's order of removal becomes administratively final) plus an additional 90 days. *See Moallin v. Cangemi,* 427 F.Supp.2d 908, 914–15 (D.Minn.2006) (discussing *Zadvydas* ). Detention beyond that period is presumptively unreasonable, and hence unlawful, unless "removal is ... reasonably foreseeable." *Zadvydas,* 533 U.S. at 699, 121 S.Ct. 2491.

The rule of *Zadvydas* is easily applied in routine cases in which there is no question about when the removal period began to run. An alien challenging his confinement beyond six months from the beginning of the removal period bears the burden of "provid[ing] good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future...." *Id.* at 701, 121 S.Ct. 2491. The government then bears the burden of "respond[ing] with evidence sufficient to

rebut that showing." *Id.* The more prolonged the alien's detention, the lower his or her burden, because "what counts as the 'reasonably foreseeable future'" shrinks as the alien's detention drags on. *Id.*

In many cases, however—including this one—*Zadvydas* is harder to apply. The difficulty results from how § 1231(a)(1)(B) defines the beginning of the removal period. Under that provision, the removal period begins on "the latest of" several events. This necessarily means that one can only determine *retrospectively* when (or even whether) the removal period began. It follows that one's assessment of when (or whether) the removal period began might change over time.

An example will make this clear. Suppose that an alien's order of removal becomes administratively final on Day 1 because the BIA dismisses the alien's appeal. The alien then petitions the court of appeals for review of the dismissal and asks for a stay. The court of appeals does not rule on the stay order. On Day 200, the alien petitions for a writ of habeas corpus in the district court, relying on *Zadvydas.* If the alien can establish that his or her removal is not reasonably foreseeable, the alien would, as of Day 200, have a meritorious habeas claim in the district court.

But suppose that, on Day 201, the court of appeals grants the stay. Under § 1231(a)(1)(B), the stay does not suspend the removal period; instead, it *defers the start* of the removal period. Seen from Day 200, the removal period began on Day 1. But seen from Day 202, the removal period never began. And if the removal period never began, neither did the *Zadvydas* clock, and § 1226 (the provision that applies before and during immigration proceedings) rather than § 1231 (the provision that applies after immigration proceedings) governs the alien's detention.

■■ This case resembles the preceding example but involves, instead of a stay of removal, a removal order that stopped being final. When the BIA dismissed Bah's appeal of his removal order on May 23, 2005, that order became "administratively final." True, Bah petitioned the Eighth Circuit for review of the BIA order and for a stay, but that court denied Bah's stay motion. In the absence of a stay, § 1231(a)(1)(B)(ii) did not apply, and the mere fact that Bah's appeal was pending did not defer the start of his removal period. Therefore, until the Eighth Circuit granted Bah's petition for review, it seemed that Bah's removal period began on May 23, 2005.

That changed on August 9, 2006, when the Eighth Circuit granted Bah's petition and remanded his case to the BIA. The removal order that was "administratively final" before August 9 was not "administratively final" after August 9. From the pre-August 9 perspective, Bah's removal period began on May 23, 2005; from the post-August 9 perspective, Bah's removal period still has not begun.

The post-August 9 perspective animates the government's argument as to why *Zadvydas* does not entitle Bah to habeas relief. *See* Resp't's Return at 11–12. The government's argument is simple: After August 9, Bah's removal order is no longer administratively final. Because the removal order is no longer administratively final, the removal period has not begun to run. Because the removal period has not begun to run, *Zadvydas's* six-month clock has not begun to tick. Hence the continued confinement of Bah is not inconsistent with *Zadvydas.*

■ The Court agrees with the government regarding the effect of the Eighth Circuit's decision. Once the Eighth Circuit granted Bah's petition for review and remanded his case to the BIA for further proceedings, his removal order was no longer administratively final. It does not necessarily follow, however, that the government can continue to confine Bah.

The Court is not aware of any reported decision that squarely addresses the legal implications of the fact that, under § 1231, time that was once characterized as removal-period and *post*-removal-period detention might be transformed by later events—such as a circuit court's granting a petition for review—into *pre*-removal-period detention. Courts have, however, resolved this problem implicitly in cases involving stay orders.

Stay orders are generally issued after removal orders become administratively final, and § 1231(a)(1)(B)(ii) obviously contemplates that once a stay order is issued, time that seemed to be removal-period or post-removal-period detention before the stay order's issuance will (at least in most cases) be recharacterized as pre-removal-period detention after the stay order's issuance. In cases involving stay orders, courts have taken two different approaches to determining how detention time should be characterized for *Zadvydas* purposes.

Under the first approach, a stay order causes *all* "time served" to be recharacterized as pre-removal-period detention, and *none* of it counts as removal-period or post-removal-period time for purposes of *Zadvydas.* This approach—call it the "retrospective-recharacterization" approach—finds support in the Second Circuit's observation in *Wang v. Ashcroft* that "where a court issues a stay pending its review of an administrative removal order, the alien continues to be detained under [§ 1226] until the court renders its decision." 320 F.3d 130, 147 (2d Cir.2003). (To be detained under § 1226 is to be in pre-removal-period detention.) Although this remark was pure dictum—in *Wang,*

the court both rejected the alien's assertion that his detention had been stayed and held that any claim related to § 1226 detention was moot—a number of district courts have followed it. *See, e.g., Alafyouny v. Chertoff,* No. 06–0204, 2006 WL 1581959, at *10–12, 2006 U.S. Dist. LEXIS 40854, at *35–39 (N.D.Tex. May 19, 2006) (collecting cases); *Haynes v. Dep't of Homeland Sec.,* No. 05–0339, 2005 WL 1606321, at *3 n. 4, 2005 U.S. Dist. LEXIS 13662, at *8–11 n. 4 (M.D.Pa. July 8, 2005); *Fuller v. Gonzalez,* No. 04–2039, 2005 U.S. Dist. LEXIS 5828, at *6–8 (D.Conn. Apr. 8, 2005).

▆▆▆ A second approach—call it the "unencumbered-time" approach—focuses on counting the amount of removal-period and post-removal-period time during which immigration officials could lawfully have removed the alien. All of this "unencumbered" time—for example, time between an administratively final removal order and a stay order, and time after lifting of a stay but before actual removal—counts toward the six-month *Zadvydas* period. But all of the time during which a stay is in effect is considered "encumbered" and does not count for *Zadvydas* purposes. The Eleventh Circuit seemed to reflect this approach when it remarked in a footnote that a *Zadvydas* claim rejected for other reasons also failed because a stay order "interrupted the running of time under *Zadvydas* " and therefore the petitioner "did not have even an unencumbered month of detention … let alone the requisite six months" called for in *Zadvydas. Akinwale v. Ashcroft,* 287 F.3d 1050, 1052 n. 4 (11th Cir.2002). Similarly, the district court in *Rajigah v. Conway* evaluated a habeas petitioner's *Zadvydas* claim by subtracting from his total detention time those months during which a stay was in effect. (At the time the court considered the case, the stay had been lifted.) 268 F.Supp.2d

159, 164–66 (E.D.N.Y.2003). *Rajigah* held that the petitioner had met his initial burden under *Zadvydas* because immigration officials had either five or six "unencumbered months" to remove him. *Id.* at 166.

The unencumbered-time approach has intuitive appeal, but it is hard to square with the text of the statute. Section 1231(a)(1)(C)—entitled "Suspension of period"—provides specifically for extending the removal period if the alien frustrates his removal. Under that provision, time during which the alien frustrates his removal is "suspended"—that is, treated as "encumbered"—and the alien's detention may be extended even though the removal period's start date is unchanged. Congress could have similarly provided that, although the removal period begins when a removal order is administratively final, that period is suspended when a court stays the order, just as the removal period is suspended when the alien frustrates his removal. Instead, Congress specified that a stay order defers the *beginning* of the removal period.

At the same time, retrospectively recharacterizing the *entire* preceding period of an alien's detention in light of a subsequent stay order has its own problems. For one thing, it is unclear how, after a stay has been lifted, a court using the retrospective-recharacterization approach should count the time that the alien was in custody before the stay was imposed or while the stay was in effect. If the stay's *imposition* transmuted all earlier time into *pre* removal-period detention, does the stay's *lifting* re-transmute the time before the stay's imposition into removal-period and *post*-removal-period detention?

The retrospective-recharacterization approach may also create constitutional problems in light of the Supreme Court's decision in *Demore v. Kim,* 538 U.S. 510, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003). *De-*

*more* involved a constitutional challenge to the mandatory *pre*-removal-period detention of criminal aliens under § 1226(c). *Demore* held that Congress "may require that [criminal aliens] be detained for the *brief period* necessary for their removal proceedings." 538 U.S. at 513, 123 S.Ct. 1708 (emphasis added). In distinguishing *Zadvydas, Demore* emphasized the brief and limited time period of pre-removal-period detention under § 1226(c):

> While the period of detention at issue in *Zadvydas* was "indefinite" and "potentially permanent," the detention here is of much shorter duration.... Under § 1226(c), not only does detention have a definite termination point, in the majority of cases it lasts for less than the 90 days we considered presumptively valid in *Zadvydas* .... [T]he detention at stake under § 1226(c) lasts roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal.

*Id.* at 528–30, 123 S.Ct. 1708 (footnotes and citations omitted).

Given *Demore's* repeated references to the brief and finite duration of § 1226 detention, it is quite possible that the Constitution requires some time limits on that detention—or at least that, as in *Zadvydas,* such time limits should be read into the statute to avoid constitutional problems. The retrospective-recharacterization approach may create constitutional problems whenever (1) an alien who had a valid *Zadvydas* claim under § 1231 (the removal-period and post-removal-period provision) before an event leading to retrospective recharacterization is (2) retrospec-

tively deemed to have been detained under § 1226 (the pre-removal-period provision).

Indeed, several courts have held or stated that detention under § 1226 is subject to substantive or procedural limits not found in the statute's text. For example, the Sixth Circuit, in *Ly v. Hansen,* construed § 1226 to implicitly limit pre-removal-period detention to a "reasonable time" and affirmed habeas relief for an alien who was detained for 18 months under the statute. 351 F.3d 263, 270 (6th Cir.2003); *see also Oyedeji v. Ashcroft,* 332 F.Supp.2d 747, 752–54 (M.D.Pa.2004) (without stating whether the challenged detention was under § 1226 or § 1231, applying *Zadvydas* to grant habeas relief in a case in which an alien's detention was stayed, and observing that "[t]he price for securing a stay of removal should not be continuing incarceration").[10] In addition, two district courts have held that aliens detained under § 1226(c) have a right under the Due Process Clause to a hearing to challenge their lengthy detention under the statute, notwithstanding that § 1226(c) renders that detention mandatory. *See Haynes,* 2005 WL 1606321, at *3–5, 2005 U.S. Dist. LEXIS 13662, at *10–15; *Fuller,* 2005 U.S. Dist. LEXIS 5828, at *14–17.

Closer to home, Magistrate Judge Susan R. Nelson of this District, in a Report and Recommendation adopted without change by Chief Judge James M. Rosenbaum, applied the principles of *Zadvydas* to evaluate the habeas petition of an alien whose removal was, according to the government, subject to a stay order. *Moallin v. Cangemi,* 427 F.Supp.2d 908, 910, 924–29 (D.Minn.2006). Judge Nelson assumed for the sake of argument that the alien was in preremoval-period detention under § 1226.

---

10. *Oyedeji* is, as a matter of statutory interpretation, incorrect in at least one respect: Section 1231(a)(1)(B)(ii), which provides that a stay order defers the start of the removal period, necessarily contemplates that at least *some* "continuing incarceration" will result when a court stays an alien's removal.

*Id.* at 925. The alien had been in § 1226 custody for over 13 months, and Judge Nelson concluded that any § 1226 detention beyond the six-month period implicitly recognized as reasonable in *Demore* should count toward the *Zadvydas* six-month clock. *Id.* at 926. Given the length of the alien's detention and "in the absence of any plan or timetable" for his removal, Judge Nelson recommended that his habeas petition be granted. *Id.*

By contrast, Judge Callahan of the Ninth Circuit has stated, in a dissent, that *Demore* "may be read . . . as holding that because the removal proceedings are by definition finite, there is *no constitutional limit* to the duration of detention under § 1226(c)." *Tijani v. Willis*, 430 F.3d 1241, 1252 (9th Cir.2005) (Callahan, J., dissenting) (emphasis added). Judge Callahan focused on *Demore's* observation that pre-removal-period detention under § 1226(c) has "a definite termination point," 533 U.S. at 529, 121 S.Ct. 2404, rather than on *Demore's* language about the brief duration of such detention. *Tijani*, 430 F.3d at 1252 (Callahan, J., dissenting).

This Court believes that allowing unlimited pre-removal-period detention under § 1226 would be inconsistent with the reasoning underlying *Zadvydas*. *Zadvydas* stated that indefinite post-removal-period detention under § 1231(a)(6) would raise "serious constitutional concerns," 533 U.S. at 682, 121 S.Ct. 2491. Judge Callahan in *Tijani* started from the premise that § 1226 detention is *never* potentially indefinite. To the extent that § 1226 detention must always, at some point, either end or become § 1231 detention, Judge Callahan is correct. But if an alien's continuous detention under § 1226 and § 1231 *combined* is potentially indefinite—something that the alien must now establish as to § 1231 detention under *Zadvydas* and would have to establish as to § 1226 detention if *Zadvydas* were extended to such detention—similar constitutional concerns arise regardless of how the detention is characterized by a court. (Of course, to an alien, detention is detention. He or she is no more free when detained under § 1226 than when detained under § 1231.)

 Further, *Zadvydas* held that detention under § 1231 was limited by the rationale of the statute, described by the Supreme Court as "assuring the alien's presence at the moment of removal." 533 U.S. at 699, 121 S.Ct. 2491. Section 1226 should similarly be interpreted in light of its purpose, which the Supreme Court characterized this way in *Demore*:

Such detention [under § 1226(c)] necessarily serves the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed.

538 U.S. at 528, 123 S.Ct. 1708. As this excerpt makes clear, § 1226 serves the same ultimate purpose as § 1231: assuring that removable aliens will in fact be removed. But if that removal is not reasonably foreseeable (the necessary condition for a successful *Zadvydas* claim), then there is no more justification for pre-removal-period detention under § 1226 than there is for post-removal-period detention under § 1231(a)(6). This is particularly true where, as here, the removal order's finality is disturbed. A removal that was legally sanctioned but factually unlikely (the basis for a *Zadvydas* claim) remains factually unlikely but becomes, in addition, legally uncertain.

As this discussion makes plain, adopting the retrospective-recharacterization approach in this case—that is, treating every day that Bah has been in custody so far and every day that Bah remains in custody

until his removal order becomes administratively final as *pre*-removal-period detention—would raise difficult constitutional questions with respect to the length of time that an alien can be detained under § 1226. Applying the unencumbered-time approach, by contrast, raises fewer constitutional questions, but it also accords less well with the text of § 1231.

█ The problem with both approaches stems from a common source: The language and structure of § 1231 seem not to contemplate the possibility of a case like this one, in which a long time passed during which the alien could have been removed under a final order of deportation, but that final order of deportation was then suspended by judicial review without a stay ever having been entered. Section 1231 seems instead to contemplate that, unless a stay has been entered, aliens like Bah will be removed while their petitions for review are pending.[11]

Indeed, the statute's focus is ensuring such removal. Section 1231 is directed primarily to regulating the behavior of immigration officials, not to securing the rights of detained aliens. Section 1231(a)(1)(B) defines the removal period to begin as soon as immigration officials can lawfully remove an alien subject to a removal order. Once lawful removal is possible, the statute directs immigration officials to act promptly and remove the alien within 90 days. But because it would be unreasonable to expect immigration officials to meet this 90-day deadline if they cannot lawfully execute the removal order—whether because the order is not administratively final (§ 1231(a)(1)(B)(i)), or because the order has been stayed (§ 1231(a)(1)(B)(ii)), or because the alien is

locked up on other charges (§ 1231(a)(1)(B)(iii))—the clock for removal does not start to run until the order can lawfully be executed.

The suspension provision in § 1231(a)(1)(C) is different. This provision assumes that removal is possible under the law (i.e., the removal period has begun) but impossible in practice. Where the alien himself creates the practical impossibility, immigration officials cannot reasonably be held responsible for meeting a 90-day removal deadline, so § 1231(a)(1)(C) relieves them of that deadline.

Once the statute is understood to require diligence on the part of immigration officials, the unencumbered-time approach seems appropriate in a case like this. Otherwise immigration officials' lack of diligence in executing a removal order will be excused by a circumstance—the belated granting of a petition for review—that the officials themselves worked to prevent. Moreover, rejecting the unencumbered-time approach would lead to the perverse result that an alien with a winning *Zadvydas* claim who was entitled to habeas relief on one day could find himself in a *worse* position the next day after *succeeding* on his petition for review of his removal order.

The question, then, is whether Bah has a winning *Zadvydas* claim based on the amount of unencumbered time he has spent in detention. As explained below, the Court believes that he does.

2. Application of the Unencumbered-Time Approach in this Case

█ The BIA dismissed Bah's appeal of his removal order on May 23, 2005.

11. Removal of aliens while their petitions for review are pending seems to be a fairly routine aspect of immigration-law practice. *See* Trina Realmuto, *Return to the United States After Prevailing on a Petition for Review* (Am. Immigration Law Found., Practice Advisory Jan. 17, 2007), *available at* http://ailf.org/lac/lac_pa_11607.pdf (on file with the Court).

CAR vol. 1 at 73. This date is therefore the starting point for calculating how much unencumbered time Bah has spent in custody.

The government seems to argue that the removal period should be extended in this case under § 1231(a)(1)(C) because Bah has frustrated his removal. Specifically, the government asserts that Bah is "completely responsible" for Liberia's refusal to issue travel documents for Bah. Resp't's Return at 10. Judge Mayeron carefully considered this argument and properly rejected it. R & R at 19–22. The government points to Bah's appeal of his removal order and his application for TPS as acts that Bah has taken that have caused the Liberian government not to issue travel documents. This Court agrees with other district courts that an alien is not responsible for frustrating his or her removal for purposes of § 1231(a)(1)(C) merely because a foreign government will not issue travel documents while the alien is seeking legal relief from a removal order. *See Arevalo v. Ashcroft,* 260 F.Supp.2d 347, 349 (D.Mass.2003), *vacated as moot,* 386 F.3d 19 (1st Cir.2004); *Rajigah,* 268 F.Supp.2d at 165; *Seretse–Khama v. Ashcroft,* 215 F.Supp.2d 37, 51–53 (D.D.C. 2002).

■ That said, the government may be right that Bah's application for TPS should suspend the removal period. If so, however, it is not for the reason advanced by the government (i.e., Liberia's response to Bah's legal situation), but rather because the government cannot lawfully remove an alien who has received TPS. *See* § 1254a(a)(1)(A) (the government *"shall not remove* the alien from the United States during the period in which [TPS] is in effect") (emphasis added). CIS granted TPS to Bah on June 21, 2005 and did not withdraw it until September 13, 2005 (though CIS notified Bah of its intent to withdraw his TPS much earlier, on July 15, 2005). Bah's appeal of that withdrawal was dismissed by the AAO on January 18, 2006. CAR vol. 2 at 52–59.

Thus, while Bah was in custody, the government could not have lawfully deported him for either three months (the time he had TPS) or seven months (the time he had TPS plus the time until the AAO decided his appeal), depending on one's view of the law. These months should at least arguably be regarded as "encumbered" removal-period and post-removal-period time—that is, they should not count against the *Zadvydas* clock—either because TPS under these circumstances is analogous to receiving a stay, or because securing TPS is an act "to prevent the alien's removal" under § 1231(a)(1)(C).

But Bah was in removal-period and post-removal-period custody during the 14 months from the BIA's dismissal of his appeal on May 23, 2005—at which time immigration officials were lawfully free to remove him—to the Eighth Circuit's grant of Bah's petition for review on August 9, 2006. Even assuming that the Court should subtract seven months from this 14-month period, Bah's "unencumbered" removal-period and post-removal-period detention has exceeded the six-month period of combined removal-period and post-removal-period detention deemed presumptively reasonable in *Zadvydas.*

Under *Zadvydas,* then, Bah must "provide[ ] good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future...." [12] 533 U.S. at 701, 121 S.Ct. 2491. Judge Mayeron found that Bah had met this burden, R & R at 16–17, and the Court agrees.

**12.** The government badly misstates the law when it asserts that Bah must demonstrate that his detention is "potentially permanent." Resp't's Return at 7.

The record reveals that in 2005 the government understood that it had an obligation to remove Bah promptly. The government scheduled Bah to be removed that September on a government-run flight. CAR vol. 1 at 87. That removal did not occur, despite the government's assurance to Bah in August 2005 that "[y]our removal has been scheduled for the near future." *Id.* at 79. In April 2006, the government was less positive, telling Bah only that "[t]here is no indication at this time" that Liberia would not issue travel documents. CAR vol. 1 at 77. The government's failure to remove Bah between May 23, 2005 and August 9, 2006—even if during some of that time Bah was not removable because of his TPS—is, on this record, sufficient to meet Bah's initial burden under *Zadvydas.*

 The government could defeat Bah's *Zadvydas* claim by providing evidence that Bah's removal *is* significantly likely in the reasonably foreseeable future. This Court agrees with Judge Mayeron that the single piece of evidence submitted by the government—an affidavit from Scott Baniecke, the local Field Office Director of ICE, Resp't's Return Ex. 1 ("Baniecke Aff.")—is insufficient. *See* R & R at 23–24. Baniecke's affidavit consists almost entirely of generalities and hypothetical statements. Baniecke asserts:

> The Government of Liberia does issue travel documents for the purpose of removal of citizens of Liberia from the United States.... The Government of Liberia['s] issuance of travel documents is historically slow. Issuance of these documents may take as long as 12 months, depending on circumstances.... Historically [Liberia] will not issue a Travel Document until there is an Administrative Final Order of Removal in the case. I have not ... been told by a representative of the govern-

ment of Liberia that it would not issue a travel document for Mr. Bah.... I reasonably expect that the Liberian government will issue a travel document if Mr. Bah is issued a final order of removal.

Baniecke Aff. ¶¶ 4–6. Baniecke's only factual assertion related specifically to Bah's case is a double negative: Liberia has *not* told ICE that it would *not* issue a travel document. Other factual assertions— Liberia's slowness in issuing travel documents—may explain why Bah has not yet been removed, but they do not demonstrate that his removal is significantly likely in the reasonably foreseeable future.

 On this record, Bah has established that he has been detained for more than six unencumbered months after his removal order became final. He has also provided evidence, which the government has failed to rebut, that his removal is not significantly likely in the reasonably foreseeable future. Accordingly, notwithstanding the fact that the IJ's removal order is no longer final, this Court holds that Bah is entitled to habeas relief under *Zadvydas.*

This means that Bah must be released from custody. This does not mean, though, that the government cannot impose reasonable conditions on Bah to protect the public and to ensure that Bah can be found if and when the time comes to remove him. As *Zadvydas* emphasized, Congress has the right "to remove aliens, to subject them to supervision with conditions when released from detention, [and] to incarcerate them where appropriate for violations of those conditions." 533 U.S. at 695, 121 S.Ct. 2491. Section 241.13(h) of Title 8 of the Code of Federal Regulations provides for subjecting aliens who are released from custody under *Zadvydas* to appropriate release conditions. The Court will therefore direct the government to impose, through an order of supervision,

release conditions as prescribed by 8 C.F.R. § 241.13(h), and to report back to the Court on both the fact of Bah's release and the release conditions imposed.

## ORDER

Based on the foregoing and on all of the files, records, and proceedings herein, the Court OVERRULES the government's objection [Docket No. 30], OVERRULES IN PART Bah's objection [Docket No. 31], and ADOPTS IN PART Judge Mayeron's Report and Recommendation [Docket No. 29] to the extent that it is consistent with this Memorandum Opinion and Order. Accordingly, IT IS HEREBY ORDERED THAT:

1. Petitioner's Motion to Amend Pleadings [Docket No. 18] and Motion to File Out of Time [Docket No. 25] are GRANTED. Accordingly, petitioner's Verified Petition for a Writ of Habeas Corpus Together with Complaint for Declaratory and Injunctive Relief and Complaint for Mandamus to Compel Reinstatement of Approval of Temporary Protected Status Application [Docket No. 20] is deemed to have been properly filed.

2. Petitioner's requests for relief related to his TPS status [Docket No. 20] are TRANSFERRED under 28 U.S.C. § 1631 to the United States Court of Appeals for the Eighth Circuit.

3. Respondents' Motion to Dismiss Petitioner/Plaintiff's Complaint Requesting Mandamus and Declaratory Relief [Docket No. 22] is DENIED as moot.

4. Petitioner's application for a writ of habeas corpus under 28 U.S.C. § 2241 [Docket No. 20] is GRANTED:

 a. Respondents are ORDERED to release petitioner from custody on or before May 4, 2007, subject to appropriate release conditions to be imposed by respondents in an order of supervision in accordance with 8 C.F.R. § 241.13(h).

 b. Respondents are further ORDERED to report to this Court, within seven days of the date of this Order, the fact of Petitioner's release and any conditions imposed on that release.

LET JUDGMENT BE ENTERED ACCORDINGLY.